**HARTFORD–EMPIRE CO. v. NIVISON–WEISKOPF CO., and five other cases.**

**Nos. 5752, 5753, 5997–6000.**

Circuit Court of Appeals, Sixth Circuit.

May 12, 1932.

W. J. Belknap, of Detroit, Mich., and R. D. Brown, of Hartford, Conn. (Daniel H. Armstrong, of Columbus, Ohio, and Vernon M. Dorsey, of Washington, D. C., on the brief), for Hartford-Empire Co.

William R. Wood, of Cincinnati, Ohio (Edmund P. Wood, of Cincinnati, Ohio, on the brief), for Nivison-Weiskopf Co.

Charles Neave, of New York City (Stephen H. Philbin, of New York City, and Howard R. Eccleston, of Washington, D. C., on the brief), for Kearns-Gorsuch Bottle Co.

Drury W. Cooper, of New York City (Allan C. Bakewell, of New York City, on the brief), for Lamb Glass Co.

Before MOORMAN, HICKS, and SIMONS, Circuit Judges.

MOORMAN, Circuit Judge.

The Hartford-Empire Company brought suit against the Nivison-Weiskopf Company in the District Court for infringement of the Steimer patent, 1,564,909, the Peiler patent, 1,573,742, known as the "phase change" patent, and Peiler patent, 1,589,304, referred to as the "shear-height" patent. Subsequently it brought suit against the Kearns-Gorsuch Bottle Company for infringement of the same three patents and another Peiler patent, 1,631,107, referred to as the "whittling" patent. Suit was also brought by the Hartford Company against the Lamb Glass Company on the Steimer patent, the Peiler "phase change" patent, the Peiler "whittling" patent, and two other patents, Soubier, 1,574,709, and Ferngren, 1,574,739. The Steimer patent was held invalid in the District Court in each of the three cases. The suits on the Peiler "phase change" patent were based on method claims 1 to 10 and apparatus claims 15 to 30, inclusive, and 33, 34, 36, and 37. In the Nivison-Weiskopf Case both the method and the apparatus claims in suit were sustained and held infringed. The injunction against infringement issued, however, only on method claims 1 to 5, inclusive, and 8, 9, and 10, and on apparatus claims 18, 22, 27, 28, 33, 34, 36, and 37. In the Kearns-Gorsuch and Lamb Cases the method claims were held invalid, but apparatus claims 18, 26, 27, 28, 34, 36, and 37 were held valid and infringed. The court did not pass upon the other apparatus claims involved in the suit. The Peiler "shear-height" patent was held invalid for want of invention in the two cases in which it was in suit. The "whittling" patent involved in the Kearns-Gorsuch and the Lamb Cases was held in each case to be invalid, and the Soubier and Ferngren patents, which were sued upon only in the Lamb Case, were held invalid. Appeals were taken by the plaintiff in each case where the claims sued upon were declared invalid, and by the defendants from so much of the decrees as adjudged the Peiler "phase change" patent valid and infringed.

All the patents relate to feeding gobs or charges of molten glass into molds for the manufacture of bottles or other blown or pressed glassware. The Steimer patent, the first of the several patents to issue, contains six claims, all of which are relied upon. Claim 2 is printed in the margin as typical.[1] Steimer's original application disclosed a furnace to melt the glass ingredients, an "interrupter" chamber to receive the molten glass, a "conical" orifice in the bottom of the chamber, and a stopper plunger with a "conical end" reciprocating vertically in the chamber. The method of operation was to tilt the furnace and permit the glass to flow into the chamber, while at regular and determinable intervals the plunger would be brought to seat against the outlet and "stop the flow [of glass therethrough] by constricting the passage."

The original Steimer application was filed February 12, 1910, but the patent did not issue until December 8, 1925. In 1918 Steimer died, and some time prior to 1920 the plaintiff purchased the Steimer application.

---

[1] "The combination with a container for molten glass having an outlet, of means adapted to be projected into and withdrawn from said outlet, operating means for periodically projecting said first-named means into said outlet, and means for adjusting the extent of projection into said outlet while the first-named means are moving."

On February 4, 1920, plaintiff filed an amended application, and contemporaneously therewith or shortly thereafter added the claims in suit. Up to that time there was no disclosure in Steimer of a purpose to claim suspended gob feeding or severing in suspension. Steimer's concept, as evidenced by the claims filed prior to the plaintiff's purchase of the application, was to utilize the plunger as a stopper to close the orifice in the bottom of the chamber. This was shown, not only by the original claims, but also by the original specifications, which repeatedly characterized the plunger as a "stopper" or "interrupter stopper." It is true that the specifications casually mentioned the screw 53a as so positioned that it might be caused to strike a projection on the frame of the machine and thus stop the downward stroke of the plunger, but it is obvious that this screw was regarded as having no other useful function than to prevent the seating of the plunger too violently against the bottom of the chamber in cutting off the flow of the glass through the orifice.

Steimer was not the first to conceive, if indeed he ever conceived, suspended gob feeding by means of coaction between accelerating means and a shearing operation. This conception was disclosed in Hitchcock, No. 805,068, November 21, 1905 [see Hartford-Fairmont Co. v. United States Glass Co. (D. C.) 2 F.(2d) 109], Brookfield, No. 883,-779, and other earlier devices. In some of these devices, at least Hitchcock and Lott, No. 1,382,994, the shaping of the depending gob was inherent in the device. Steimer did not attempt to shape mold charges, but used his plunger to stop or interrupt the flow of the glass through the orifice. The jets of flame which he provided were not intended to sever the extruded glass, but to burn off the adhering strings after the plunger had severed the gob by closing the orifice. It was not until after the Hartford Company acquired the Steimer application that any attempt was made to claim for Steimer the concept or disclosure of shaping mold charges by suspended feeding and severing in suspension. We need not trace the history of these many attempts in the Patent Office, all of which were unsuccessful. It suffices that through a maze of disallowed claims, provoked interferences, and Patent Office contests prosecuted in some instances as bona fide contests, after the Hartford Company had acquired its adversary's rights, there finally emerged a patent containing six claims out of more than one hundred that had been sought. Some of these allowed claims, such as claims 2 and 3, call for "means for adjusting the extent" of the plunger projection into the orifice during the operation; others for means for adjusting "the nearest position" of the plunger to the orifice during the operation. None of them discloses or claims shaping by suspended gob feeding and severing in suspension. Considered in the light of the specifications, they are to be interpreted as calling for a mechanism in which there is a plunger that stops the flow of the glass either by coming to seat over the orifice on the bottom of the chamber or by projecting into the orifice and closing it. Plainly there was nothing new in these claims as against the earlier patents. Nor was Steimer, as is now contended, the first to perceive the desirability of a feeder having an orifice through which the glass might flow by gravity and a reciprocating element which by its downward movement impels the flow of glass and which does not contact with the orifice. We cannot agree that Steimer's plunger did not contact with the orifice, but, even if it did not, these elements of his claims, in like combination, were disclosed in the prior art, even the element of adjusting the end of the downward stroke of the plunger. Whether this adjustment in the plunger stroke in the earlier devices could be effected while the plunger was in motion does not seem to us to be important, for in our view it was not invention to devise stop means for a plunger adjustable while the plunger is in action, but an expedient that any skilled mechanic could devise had he in view an object that made it desirable.

The Peiler "phase change" patent was issued February 16, 1926, on an application filed November 25, 1925. The application states that it is a continuation in part of application No. 713,143, filed August 3, 1912, application No. 157,943, filed March 28, 1917 (it in itself being a continuation of application No. 856,548, filed August 13, 1914), and applications Nos. 294,792 and 294,793, both filed May 5, 1919, the former of the two last-mentioned applications being referred to in argument as the "paddle needle" application and the latter as the "single plunger" application. The specifications are made up of excerpts from these several former applications, with such new matter as Peiler presumably considered necessary "for the purpose of claiming" what he calls "phase changing." The first ten claims are for a method. The remaining claims are for an apparatus. We deal first with the method claims.

"Phase change" is an artificial term invented, or at least used, by Peiler to define the shaping of mold charges by time change between feeding and shearing. Thus any apparatus which by adjustment of its parts is capable of accomplishing this result must practice phase changing in this sense. It is essential to the practice in all of the known devices that there be suspended molten glass, impelling means for accelerating the flow of glass from the outlet, means for severing, and means for varying the operating relation of the impelling means to the severing means. Long before Peiler there was in common use a type of feeder comprising a container having a submerged discharge orifice, a periodically reciprocating plunger above the orifice, shears below the orifice, and mechanism actuating the shears in timed relation to the plunger. These devices were capable of adjustment so as to vary the time of the shearing operation in relation to the cycle of the plunger stroke. Any variation in the relation between these two operating means effected a change in the size and form of the mold charges. This character of phase changing was disclosed in Hitchcock, Brookfield, Lott, and other feeders before Peiler's "punty" application was filed in 1912. Indeed, Peiler expressly disclaimed any method of forming masses of molten glass by causing it to flow through an opening in the bottom of a supply reservoir, applying intermittent impulses to the glass, and severing it below the opening while "hanging freely." Similarly he disclaimed the forming of a mass of molten glass and causing it to assume "a predetermined shape" or "shaping" it "into an elongated mass of controllable cross-sectional area." It is plain, therefore, that Peiler was not the inventor of suspended charge feeding or shaping charges while in suspension.

While the earlier devices were capable of severing gobs of substantially uniform size and shape as well as of adjustment or reorganization so as to vary the shearing operation in relation to the cycle of the plunger, none of them was susceptible to this adjustment during the operation of the device. The changing of this relation during the feeding of the charges was first suggested in a Peiler application filed in 1917, but no sufficient disclosure of it was made therein nor in any of the other Peiler applications prior to the "paddle needle" and "single plunger" applications of May 5, 1919. The thought seems to have come to Peiler about the time these last-mentioned applications were filed. Certainly none of the method claims here in suit appeared in any application before that date. We agree with the decisions below that none of them is entitled to an earlier date.

▪ Accepting May 5, 1919, as the probably correct date of invention, the defendants insist, upon the authority of Webster Electric Co. v. Splitdorf Electric Co., 264 U. S. 463, 44 S. Ct. 342, 68 L. Ed. 792, and other cases, that since the plaintiff might have divided its 1919 applications and obtained a divisional or separate patent on the phase changing feature disclosed therein but did not, the claims here in suit involving this feature should be declared inoperative because of laches, equitable estoppel, and the intervention of public and private rights. It is true that the applications of May 5, 1919, disclosed phase-changing in the course of practicing the process, and quite as true that this feature of the applications might have been made the subject of a separate patent. Furthermore, so far as we have been able to ascertain, it does not appear that the phase-changing feature of these applications encountered any interference in the Patent Office. But the plaintiff was making claims to a broad process of which "phase change" was but one of several steps. And while one cannot unreasonably delay the prosecution of his patent application and thus prolong his patent monopoly, where, as in this case, the applicant has complied with all the rules of the Patent Office, we do not think it is required by Webster Electric Co. v. Splitdorf Electric Co., supra, that he be held guilty of laches or be estopped from claiming a valuable feature of his patent merely because he has not sought a separate patent therefor, but has elected to prosecute his application for the broader claims which include the separably patentable feature. Cf. Overland Motor Co. v. Packard Motor Car Co., 274 U. S. 417, 47 S. Ct. 672, 71 L. Ed. 1131. The circumstances in which the patentee acted in the present case are wholly unlike those considered in Macbeth-Evans Glass Co. v. General Electric Co., 246 F. 695 (6 C. C. A.) and Woodbridge v. United States, 263 U. S. 50, 44 S. Ct. 45, 68 L. Ed. 159. The broader claims were prosecuted with due diligence. Phase changing was a feature of those claims, without which the process might be worthless. We cannot think that the failure, in these circumstances, to divide out this single separable step invalidates the patent when issued.

▪ Coming to an examination of the claims, we find that none of them, except claim 2,

specifically calls for a changing of the time relation between the plunger stroke and the severing during the feeding of the charges. Claim 2 calls for a method including "progressively varying during the feeding of the charges the time relation between the production of each downward feed and the time of severing of a charge therefrom to produce a desired change in the mold charges." Claims 5, 8, and 9 call for successive mold charges implying that the advancing or retarding of the impelling operation in relation to the shearing occurs during such successive feeding. We think they are to be so construed. The other claims, however, merely call for a time relation between the feeding and severing varying with the desired shape. These claims, it seems to us, read upon any process in which the operating relation between the shearing and the plunger action or other accelerating means may be so changed as to vary the shape and size of the severed gob, irrespective of whether the change can or cannot be made while the feeding is being done. Phase change in this sense was disclosed, as we have seen, in earlier patents, including Steimer. But claim 2 and claims 5, 8, and 9, as interpreted above, call for the additional step of changing this relation during the feeding operation. This further step is of undoubted value, marking an advance which we think is entitled to patentability. We cannot agree that it constitutes nothing more than a function of the machine (Northern Equipment Co. v. McDonough Automatic Regulator Co., 300 F. 488 [6 C. C. A.]), or that it is met by prior art feeders such as those used by Miller, Tucker & Reeves, Brockway and Owens, or is disclosed in prior practices. In our view it is a step that has made a new process which has proved to be highly useful. It is true that this process is practiced by plaintiff's machine, but it may also be practiced by different mechanisms or machines (see the Nivison-Weiskopf pneumatic feeder), and is plainly patentable separately from the machines by which it is practiced. Expanded Metal Co. v. Bradford, 214 U. S. 366, 29 S. Ct. 652, 53 L. Ed. 1034; Michigan Carton Co. v. Sutherland Paper Co., 29 F.(2d) 179, 182 (6 C. C. A.). We therefore hold that claims 2, 5, 8, and 9 are valid, but that the remaining process claims are invalid because calling for nothing more than the process of the prior art.

We next consider the apparatus claims in suit. These claims may be divided into two classes. Some of them call generally for an apparatus separating molten glass into mold charges including (1) a container for the glass having an outlet; (2) severing means operating periodically beneath the outlet; (3) means for timing the suspension of successive gathers of glass beneath the outlet in relation to the operation of the severing means; and (4) means for varying the time of beginning of the suspension period relative to the time of severing. These claims cannot be sustained as against the prior art, for, as has been pointed out, all the elements therein, in substantially the same physical and functional relation to each other, were disclosed in Hitchcock, Brookfield, and other patents antedating the earliest date claimed for the patent in suit. Claims falling within this class are 22, 23, 26, 27, 30, 33, 34, 36, and 37. Other claims in suit, such as claim 17, provide, however, that the means for altering the time of severing in relation to the period of suspension shall be "operable during the continued operation of the apparatus"; and others, such as claim 15, by referring to the delivery of successive masses in connection with the varying of the relation of the feeding to the shearing, must be construed as calling for such varying relation during the operation of the machine. These claims provide means for practicing the process disclosed in claims 2, 5, 8, and 9, but, so far as the claims themselves are concerned, they must be limited to the mechanical equivalents of the means disclosed in the patent specifications. As thus limited, we find that claims 15 to 21, inclusive, and claims 24, 25, 28, and 29 are valid, and that the other apparatus claims in suit are void for anticipation and want of invention.

The defendant Lamb Company interposes a separate defense to this and the other patents upon which it was sued, based on a series of transactions disclosed in certain documents introduced in evidence. The defense is grounded upon the purchase by the defendant of its machine from Miller prior to the acquisition by the plaintiff of the Miller applications pending in the Patent Office. It is claimed that the defendant occupies the status of a licensee. The trial court denied the contention. It is true, of course, that the defendant as purchaser of a Miller feeder acquired a right or license to use that feeder under any patents owned by Miller, who manufactured the feeder, or under any patents of the Miller Glass & Engineering Company, which sold the feeder to the defendant. It is, however, equally true that the purchase of the Miller applications by the plain-

tiff did not give the defendant, as licensee of Miller, any license to other patents or applications outstanding, and the suit here in question is upon a patent in which Miller had no property interest and which, rightly or wrongly, was held in the Patent Office to take precedence over the Miller applications. As to whether the plaintiff obtained this ruling in the Patent Office by the use of unfair methods is not for us to determine. For present purposes we accept the Patent Office ruling, in view of which it cannot be held that the license obtained by the defendant in the purchase of the Miller feeder included the right to use such feeder as against a patent issued upon an application in which Miller had no interest.

Each of the three defendants uses a feeder that practices phase changing during the feeding of the mold charges, and it results therefrom that each of them infringes the valid process claims of the "phase change" patent. Since that is true, it is not important whether they infringe the valid appartus claims, which claims, as heretofore indicated, are valid solely because they include in combination with the other elements therein means for changing the time of severing in relation to the feeding "during the continued operation of the apparatus." See Farrington v. Haywood, 35 F.(2d) 628 (6 C. C. A.). These means, as we have said, must be limited to the mechanical equivalents of the means disclosed in the patent specifications. It is quite conceivable that machines may be constructed embodying means effecting this result but which nevertheless do not infringe the valid apparatus claims because of lack of the necessary equivalency to the means of the patent. It should be added, also, as is plainly implied in what has heretofore been said, that the feeders used by the defendants, minus their respective means for effecting phase change during operation, do not infringe any of the valid process or apparatus claims in suit.

■ The only claim of the Peiler "shear-height" patent, 1,589,304, sued upon, reads as follows: "Glass gathering apparatus comprising a receptacle for molten glass, means for delivering formed lumps of viscous glass therefrom, and knives for severing each lump as formed, said knives being adjustable along the path of delivery of such lumps." In June, 1929, after testimony had been taken in the Kearns-Gorsuch Case, and after the Nivison-Weiskopf Case had been finally submitted, the plaintiff filed a disclaimer in the Patent Office narrowing this claim. As narrowed, the adjustable knives were limited to knives approaching the suspended glass from opposite directions at reguler intervals and coacting with each other in suitable relation to delivering means to sever mold charges and to control by their vertical position the length of the stub of glass remaining above the knives after severance. We assume without deciding that the disclaimer is valid, and we pass by the various objections that are made to the claim upon the ground that the Patent Office proceedings were invalid. The use of knives coacting with a plunger or other accelerating means for the purpose of severing mold charges was old. It was common to locate the knives beneath the interrupter chamber just below the orifice out of smearing relation with the bottom of the chamber. It was also old to use adjustable knives. Harding, 1,150,030, specifically shows shears located beneath the outlet; the shears being capable of vertical adjustment. Even if there were nothing in the prior art showing knives adjustable along the path of the delivery of the glass, there would still be lack of invention in this patent, for the reason, if for no other, that it did not require inventive thought to adapt the vertical or even horizontal adjustable shears of the prior art to the suspended gob feeder of Peiler. Cf. Paquette v. Potter Mfg. Co., 46 F.(2d) 271, 272 (6 C. C. A.); Directo-plate Corp. v. Donaldson Lithographing Co., 51 F.(2d) 199, 204 (6 C. C. A.).

■ The Peiler "whittling" patent, 1,631,-107, issued May 31, 1927, upon an application filed January 28, 1926. The patent contains thirty-two method claims, all of which were sued upon except claims 23, 24, and 27. The District Court was in doubt as to whether the whittling process was wholly theoretical or whether it had some measure of reality. It is not contended that the Lamb glass feeders infringe the patent, but that the Kearns-Gorsuch feeders do infringe. The method advanced in the patent is the severing of the glass by the shears during the upward stroke of the plunger. It is said that the plunger as it moves upward has a tendency to retract part of the suspended molten glass, and that when the cutting is done there is left a whittling effect on the suspended stub. The evidence in our opinion leaves grave doubt as to whether the cutting at the beginning of the upward movement produces the whittling effect claimed. Even if such effect is produced, it is not apparent from the record that any benefits result. And again,

if there is any beneficial result, it is effected solely by the retarding of the shearing operation in relation to the plunger stroke. This was inherent in all of the gob-feeding and severing in suspension devices prior even to the Peiler "phase change" patent. The object of these devices was to shape the mold charge by timing the shearing in relation to the cycle of the plunger. These machines were capable of practicing and, when necessary, doubtless did practice, the method of retarding the shearing operation so that it occurred contemporaneously with the beginning of the upward movement of the plunger. It is not claimed that the patent here in suit has a wider range of timing relation or of retardation of the shearing operation than was disclosed and practiced in the earlier devices. We hold that the claims in suit are invalid for anticipation and want of invention.

The remaining patents, Soubier, 1,574,709, and Ferngren, 1,574,739, relate to stirring glass in the forehearth of the furnace. Of the former, claims 14, 15, 16, 24, and 27 are in suit, and, of the latter, claims 1, 7, and 13. The Ferngren patent was issued in 1926 upon an application filed in 1925; the application being a division of an application of February 10, 1919, which latter application was a renewal of an application of September 29, 1913. The plaintiff seeks to carry back the application of 1925 to the original application of 1913, which was prior to the use by the Lamb Glass Company of its structure now asserted to be an infringement. We accept the earlier date for the purposes of this case. In the application of that date there were claims calling for a rotary bowl. Nothing was said in the claims about glass stirring or heat homogeneity, though we assume that the purpose of rotating the bowl was to stir and mix the molten glass so as to keep it at a uniform temperature. The application of 1913 was abandoned. A renewal application was filed in 1919, and there was filed about the same time an amendment asserting additional claims, none of which referred to the rotary bowl. Later other claims were filed calling in broad terms for means to cause the relative movement of the glass in the receptacle around the axis of the discharge opening. The Soubier patent issued in 1926 proposed to secure uniformity of temperature of the glass by the use of a constantly revolving bowl and a constantly revolving plunger or regulator working in the glass. This regulator was mounted to reciprocate vertically, but rotated at the same peripheral speed as the charger or bowl.

The art of stirring molten glass was not a new one when Ferngren and Soubier entered the field. It had been practiced in one form or another but slight variance from the patents here in suit by Graves & Whittemore, No. 914,823, Hall, No. 1,117,666, and others. Ferngren and Soubier of course could not get a patent on the stirring of molten glass. When they entered the field it was limited by the prior art to particular means, and the means which they devised seem to us to have been obvious. If it be admitted, however, that there was a certain patentable notion in their concepts, the range of equivalency to which they are entitled must be narrow. The defendant does not use a rotary bowl. Its forehearth is stationary. There was no showing in the proofs of any rotary motion of the glass around the defendant's outlet as in Ferngren. The only rotary motion used by defendant is that in its plunger, which, when farthest away from the outlet or at the top of its stroke, revolves or turns partially around. It does not revolve as does Soubier's, constantly. That its revolution or partial revolution at the top of its stroke stirs the glass in the forehearth to some extent and assists in maintaining uniformity of heat is true, but there is no identity of means or of operation with either Ferngren or Soubier, nor, although there is similarity, is there identity of result. We do not determine whether the claims of these two patents are valid. It is enough that the defendant does not infringe.

It results from the foregoing that the decree in the Nivison-Weiskopf Case is affirmed as to the Steimer patent and the "shear-height" patent, and in so far as it holds claims 2, 5, 8, and 9 of the Peiler "phase change" patent valid and infringed and claims 18 and 28 valid, but is otherwise reversed, except that the court does not determine whether the valid apparatus claims are infringed; that the decree in the Kearns-Gorsuch Case is affirmed as to the Steimer patent, the Peiler "shear-height" patent, the Peiler "whittling" patent, and as to the Peiler "phase-change" patent in so far as it holds method claims 1, 3, 4, 6, 7, and 10 invalid and apparatus claims 18 and 28 valid, but is reversed as to that patent in so far as it holds claims 2, 5, 8, and 9 invalid and so far as it holds apparatus claims 26, 27, 34, 36, and 37 valid and infringed; that the decree in the Lamb Glass Company Case is af-

firmed as to the Steimer patent, the Peiler "whittling" patent, and the Soubier and Ferngren patents, also as to the Peiler "phase change" patent in so far as it holds claims 1, 3, 4, 6, 7, and 10 invalid and apparatus claims 18 and 28 valid, but is reversed in so far as it holds claims 2, 5, 8, and 9 of the patent invalid and apparatus claims 26, 27, 34, 36, and 37 valid and infringed. The costs in this court will be paid by the parties on the basis of two-thirds by the plaintiff and one-third by the defendant in each case.