## WOODBRIDGE ET AL., EXECUTORS OF WOOD-BRIDGE, *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 51. Argued October 5, 8, 1923.—Decided November 12, 1923.

1. Any practice of an inventor and applicant for patent through which he, deliberately and without excuse, postpones the beginning of the term of his monopoly, and thus puts off the free public enjoyment of the invention, is an evasion of the patent law and defeats its aim. P. 55.

2. An inventor of projectiles for rifled cannon having obtained allowance of a patent from the Patent Office, procured the papers to be filed in the secret archives on a statement that he wished this for one year only as an aid in obtaining patent rights abroad, and thereafter for nearly ten years deliberately abstained from requesting issuance of his patent in order to postpone the beginning of the patent monopoly until the needs of the Government for the invention should render it of pecuniary value to himself—*Held*, that he forfeited his right to the patent, within the meaning of the special act of Congress authorizing this suit, and therefore compensation could not be recovered from the Government even if it used the invention within the period defined by that statute. Act of March 2, 1901, 31 Stat. 1788. Pp. 56, 59.

55 Ct. Clms. 234, affirmed.

APPEAL from a judgment of the Court of Claims rejecting a claim preferred under a special act of Congress, for compensation for use by the Government of an invention made by the plaintiffs' decedent.

*Mr. Henry P. Doolittle* for appellants.

*Mr. Harry E. Knight,* Special Assistant to the Attorney General, with whom *Mr. Solicitor General Beck, Mr. Assistant Attorney General Lovett* and *Mr. Melville D. Church,* Special Assistant to the Attorney General, were on the brief, for the United States.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

This suit in the Court of Claims was brought under the authority of a special act of Congress of March 2, 1901, 31 Stat. 1788, by which the claim of William E. Woodbridge, for compensation from the United States for use of his alleged invention relating to projectiles for rifled cannon, for which a patent was ordered issued by the Government, was referred to the Court of Claims to hear and determine, first, whether Woodbridge was the first and original inventor, and, second, to what extent the United States had used it and the amount of compensation which was due in equity and justice therefor, and if it found that Woodbridge was such inventor, to decide the case as if a patent had issued for seventeen years in 1852, the year in which it had been ordered to issue, with the right of appeal as in other causes—"*Provided, however,* That the said court shall first be satisfied that the said Woodbridge did not forfeit, or abandon, his right to a patent, by publication, delay, laches, or otherwise; and that the said patent was wrongly refused to be issued by the Patent Office." The Court of Claims heard the case, made findings of fact and held that the petition must be dismissed on two grounds, first, that Woodbridge had forfeited or abandoned his right to a patent by his delay or laches, and, second, that the United States had not used his invention.

From the findings of fact, it appears that Woodbridge was a man skilled in the science of projectiles and an inventor of genius and experience. In February, 1852, he filed an application for a patent for an invention which he described as consisting of "applying to a projectile to be fired from a rifled gun a rifle-ring, or sabot, in the manner hereinafter described, for the purpose of giving to the projectile the rifle motion." The Patent Office

advised him that the use of sabots or rings of soft metal applied to iron balls was known for either smooth bore or rifled guns, but after discussion allowed him two claims, the first for a smooth ring for a smooth bore cannon, and the second for a ring with exterior projections to fit into the rifled cannon, for the purpose of diminishing windage, and giving the projectile a motion in direction of the axis of the bore.

In a letter of March 23, 1852, Woodbridge wrote the Patent Commissioner, with the claims amended in the form in which the Patent Office had agreed to allow them, and said:

" I was informed, in answer to my inquiry, that upon the issue, or order to issue, of a patent, it may be filed in the secret archives of your office (at the risk of the patentee) for such time as he may desire. I wish to avail myself of this privilege when my patent may issue, in order that my ability to take out a patent in a foreign country may not be affected by the publication of the invention. If it is necessary to specify a particular time during which the patent shall remain in the secret archives, you will please consider one year as the time designated by me."

To this, on April 15, 1852, the Patent Office answered that a patent had been ordered to issue on his application and, in accordance with his request, the papers were filed among the secret archives of the office, subject to his directions as to the time of issuing them. This was done presumably under § 8 of the Act of July 4, 1836, 5 Stat. 121, which contains the following provision:

" And whenever the applicant shall request it, the patent shall take date from the time of the filing of the specification and drawings, not however exceeding six months prior to the actual issuing of the patent; and on like request, and the payment of the duty herein required, by any applicant, his specification and drawings shall be

.filed in the secret archives of the office until he shall furnish the model and the patent be issued, not exceeding the term of one year, the applicant being entitled to notice of interfering applications."

After the filing of the papers in the secret archives before April 15, 1852, nothing was done either by Woodbridge or the Patent Office for nine years and a half, when, on December 31, 1861, Woodbridge wrote to the Commissioner of Patents calling attention to his invention in 1850 and his application for a patent in 1852, the order of the office to issue the patent and the filing of the papers in the secret archives.  He said:

"I have allowed it to remain until the present time, it being only lately that any immediate opportunity of rendering it pecuniarily available has occurred."

The fourth finding of the Court of Claims was as follows:

"The reason of said Woodbridge for his delay in requesting issue of the patent allowed him was, as stated by him in communications to the Patent Office, that he thought that course best fitted to enable him to avail himself of the value of the patent, as by procuring delay in the issue of the patent the wants of the Government might demand the invention before the patent should expire, and that as the invention could be made available only by the necessities and action of the Government, he thought the intent of the law that the inventor should have 14 years' exclusive use of his invention could in no other way be so well attained in the case of this particular invention ' as by deferring the issue of the patent to a time when it could be brought into practical use.' "

In the same letter in which Woodbridge asked the issue of the patent he requested that he be permitted to amend his specifications and claims and broaden them so as to cover the use in a rifle of the sabot or ring without the projections to fit in the grooves of the bore.  Within five days

the Patent Office replied that the patent would be ordered to issue but that the defects in his specifications could only be cured by a reissue. On January 29th, before a month had elapsed, the Patent Office wrote Woodbridge another letter in answer to his letter of December 31, 1861, in which he was informed that the length of time he had allowed his invention to slumber was a bar to the issue of a patent, that for nearly ten years he had suffered his application to remain locked up not merely beyond the reach of the public but beyond even the cognizance of the examiners and other officers of the department, that meantime many patents had issued for the same invention and yet his only reason for his delay and silence was that he supposed the invention would not prove remunerative until recently. The application was rejected on the ground of abandonment. On April 15, 1862, Woodbridge appealed to the Board of Examiners in Chief and on July 10, 1862, that Board affirmed the action of the examiner. Nothing was done by Woodbridge after this until January 7, 1871, when he appealed to the Commissioner of Patents. A day was set for the hearing. Woodbridge did not get the notice. Another day was set. The Commissioner had to postpone it, and told Woodbridge he would give him another date. Nothing was done by anybody till January, 1879, when on Woodbridge's application the case was heard and the Commissioner affirmed the decision by the subordinate tribunals that the facts amounted to abandonment. Woodbridge appealed to the Supreme Court of the District, which affirmed the Commissioner on February 28, 1880.

The Court of Claims found that Woodbridge was the first and original inventor of the invention involved in the two claims recited above. It also found that the United States had not used the invention. The latter finding as one of fact is attacked on the ground that the question of infringement is a mixed question of law and fact and that

with all the devices used by the United States shown in patents subsequent to Woodbridge, which it is found the United States did use, the question of non-user is really a question of law which should be reviewed here.

The judgment of the Court of Claims was chiefly based on the conclusion of law from the facts found that Woodbridge had forfeited or abandoned his right to a patent by his delay and laches. The court also held that the claims of Woodbridge did not cover the devices the United States used.

The purpose of the clause of the Constitution concerning patents is in terms to promote the progress of science and the useful arts, and the plan adopted by Congress in exercise of the power has been to give one who makes a useful discovery or invention a monopoly in the making, use and vending of it for a limited number of years. Under the Act of February 21, 1793, § 1, 1 Stat. 318, it was for fourteen years. Under the Act of July 4, 1836, § 6, 5 Stat. 117, 119, it was fourteen years, with a right of extension under certain conditions and a proper showing for seven years longer (*idem* § 18, p. 124). Under the Act of March 2, 1861, § 16, 12 Stat. 246, 249, the term was made seventeen years without extension and this has been the term ever since. It was the legislative intention that the term should run from the date of the issue of the patent, and that, at the end of that time, the public might derive from the full specifications required in the application accompanying the patent, knowledge sufficient to enable it freely to make and use the invention. It is true that a patentee is not obliged either to make, use or vend his invention during the period of his monopoly. *Crown Co.* v. *Nye Tool Works,* 261 U. S. 24, 34; *Continental Paper Bag Co.* v. *Eastern Paper Bag Co.,* 210 U. S. 405. Congress relies for the public benefit to be derived from the invention during the monopoly on the natural motive for gain in the patentee to exploit his invention and to make, use

and vend it or its products or to permit others to do so, for profit. The importance in working out the purpose of Congress of keeping the inventor's monopoly within the term for which the patent is granted is thus shown to be capital. Any practice by the inventor and applicant for a patent through which he deliberately and without excuse postpones beyond the date of the actual invention, the beginning of the term of his monopoly, and thus puts off the free public enjoyment of the useful invention, is an evasion of the statute and defeats its benevolent aim.

In this case we have a delay of nine years and a half in securing a patent that might have been had at any time in that period for the asking, and this for the admitted purpose of making the term of the monopoly square with the period when the commercial profit from it would be highest. Not until war or fear of war came was there likely to be a strong demand for rifled cannon and their improvement. Hence, the inventor, having put his order for the issue of a patent into the secret archives of the Patent Office in 1852, sat down and waited until after the Civil War came on in 1861 before seeking to avail himself of the patent, thus postponing the time when the public could freely enjoy it for nearly ten years. Meantime other inventors had been at work in the same field and had obtained patents without knowledge of the situation with respect to Woodbridge's invention. This is not a case where evidence has to be weighed as to the purpose of the inventor. He avows his deliberate intention. This is not a case of abandonment. It is a case of forfeiting the right to a patent by designed delay. The special statute makes it a condition of any jurisdiction of the Court of Claims to render a judgment against the United States that the court shall find that claimant had not forfeited his right to a patent by delay or laches or for other reasons. This necessarily implies that there may be forfeiture by delay or laches,

and this Court has said that there may be such a forfeiture. In *Kendall* v. *Winsor,* 21 How. 322, 329, Mr. Justice Daniel, speaking for the Court, delivered a very clear and forcible opinion on what the inventors who sought patents owed the public. One passage in that opinion is apposite here:

"It is", said the Justice, "the unquestionable right of every inventor to confer gratuitously the benefits of his ingenuity upon the public, and this he may do either by express declaration or by conduct equally significant with language—such, for instance, as an acquiescence with full knowledge in the use of his invention by others; or he may forfeit his rights as an inventor by a wilful or negligent postponement of his claims, or by an attempt to withhold the benefit of his improvement from the public until a similar or the same improvement should have been made and introduced by others."

In the case before us, we have the feature last alluded to. Many inventors were at work in the same field and had made advances in the art and the Government had used them. When Woodbridge conceived that the time for him had come to assert his monopoly, he became aware of the fact that in his specifications and claims, as allowed, he had not covered the real advance made by his unconscious competitors, and that was the use in a rifled gun of a ring or sabot without projections to fit into the rifling of the bore which, because of the softness of the metal of the ring under the heat and pressure, would do so without projections; and so, nine and a half years after his patent had been allowed but not issued, he applied for a change of specifications and claims, so that he might cover the patents of these subsequent inventors.

Reference is made to the custom of the Patent Office in 1852 and its permission and acquiescence in the consignment of Woodbridge's specifications and order for is-

sue of his patent to the secret archives, as an excuse and explanation for his course. But this is no justification. By the terms of his letter directing it to be done, he said he wished to apply for foreign patents and that he would not ask delay for more than a year. Moreover, § 8 of the law of 1836, quoted above, wherein is found the only authority for such a proceeding, limits the possible period of the deposit in the secret archives to one year, for the evident purpose of preparing a model. Here the findings show that the model had been filed before the deposit, and also show that he never applied for a foreign patent. These circumstances only emphasize the truth of his avowal of 1862 that he was deliberately delaying the issue of his patent so that its term and monopoly would reach forward to include nearly ten more years of the future and cover a much more commercially lucrative period than if he had obtained his patent when he might and should have requested it. Thus he would have deprived the public of a decade of free use of the patent which the law intended. It is true that, under the special law authorizing this action, Woodbridge's representatives could not recover compensation from the Government except for the period of seventeen years from 1852. But this feature of the special law is immaterial in considering the jurisdictional question whether by his conduct he forfeited his right to his patent. That must be decided on the facts as they were between 1852 and 1862. Had he taken out his patent in 1852, he would have been entitled to a term of fourteen years with a contingent possibility of an extension for seven years more. With the change of the law in 1861, had he succeeded in his effort on the last day of that year, he would have secured a patent for seventeen years from 1862. To state it in another way, his certain term if he had been diligent and not sought to evade the law, would have expired in 1866. Had he succeeded in his illegal plan

and procured a patent in 1862, his term would have ended in 1879. Part of this unconscionable postponement of the end of his monopoly was due to the change of law in 1861, but nearly ten years, as already said, was the result of his deliberate design.

No case cited to us presents exactly these facts, but the general principles upon which this Court has proceeded in cases of abandonment by conduct and its views of the rights of the public and the purpose of the constitutional authority to grant patents and of Congress in its legislative execution of that purpose, set forth in those cases, leave no doubt of the conclusion we must reach. *Pennock* v. *Dialogue,* 2 Pet. 1; *Wyeth* v. *Stone,* 1 Story, 273, 282; *Shaw* v. *Cooper,* 7 Pet. 292; *Kendall* v. *Winsor,* 21 How. 322, 329; *Planing-Machine Co.* v. *Keith,* 101 U. S. 479, 485; *United States Rifle & Cartridge Co.* v. *Whitney Arms Co.,* 118 U. S. 22, 25.

Of course the conclusion that patents have been abandoned by conduct in such cases is reached by inference that the delay and other circumstances indicated an intention to give up effort to secure a patent. The circumstances usually relied on to show abandonment are a rejection of an application for a patent by the Patent Office and unexplained delay in prosecuting appeal from one of the several executive tribunals to another provided in the procedure of obtaining a patent. From these intent to abandon is presumed. It is urged that such authorities have no application because intent to abandon can not be inferred from the delay in this case. That is true; but our conclusion rests not on neglect and intention to give up the patent but on a deliberate and unlawful purpose to postpone the term of the patent the inventor always intended to secure.

The case which comes nearer in its facts to this than any other, and is a case of forfeiture rather than abandonment, is that of *Macbeth-Evans Glass Co.* v. *General*

*Electric Co.*, 246 Fed. 695. There, an inventor of a process for making glass used it in secret for nearly ten years, selling the product. At the end of that time when the secret was betrayed by an employee, the inventor applied for a patent. It was held by the Circuit Court of Appeals of the Sixth Circuit, in a most satisfactory opinion by Judge Warrington, that the policy of the patent law to secure to the public the full benefit of inventions after expiration of the fixed term deemed sufficient reasonably to stimulate invention, would be defeated if an inventor could withhold his invention from the public for an indefinite time for his own profit, and that the right to preserve a monopoly in an invention by keeping it a trade secret and the right to secure its protection under the patent laws were inconsistent and could not both be exercised by an inventor. The gist of the reason for the conclusion there was the same as here, that the purpose and result of the conduct of the inventor were unduly to postpone the time when the public could enjoy the free use of the invention.

Mr. Justice Clifford, in *Bates* v. *Coe,* 98 U. S. 31, when considering the validity of a reissued patent, used these words (p. 46):

" Inventors may, if they can, keep their invention secret; and if they do for any length of time, they do not forfeit their right to apply for a patent, unless another in the meantime has made the invention, and secured by patent the exclusive right to make, use, and vend the patented improvement. Within that rule and subject to that condition, inventors may delay to apply for a patent."

And in *Parks* v. *Booth,* 102 U. S. 96, 105, the same Justice said:

" Unless inventors keep their inventions secret they are required to be vigilant in securing patents for their protection."

These remarks were not necessary to the conclusion in the case he was describing, and those in *Bates* v. *Coe* have given some concern to judges having to consider actual cases of deliberate delay. Chief Justice Alvey of the Court of Appeals of the District said of them (*In re Appeal of Mower,* 15 App. D. C. 144, 152, 153):

" This, doubtless, is a correct general proposition; but like all general propositions, it may have its exceptions under special and particular circumstances, even where the intervening rights of third parties have not been secured by patent.

" The patent laws are founded in a large public policy to promote the progress of science and the useful arts. The public, therefore, is a most material party to, and should be duly considered in, every application for a patent, securing to the individual a monopoly for a limited time, in consideration for the exercise of his genius and skill. But the arts and sciences will certainly not be promoted by giving encouragement to inventors to withhold and conceal their inventions for an indefinite time, or to a time when they may use and apply their inventions to their own exclusive advantage, irrespective of the public benefit, and certainly not if the inventor is allowed to conceal his invention to be brought forward in some after time to thwart and defeat a more diligent and active inventor, who has placed the benefit of his invention within the reach and knowledge of the public."

Judge Warrington, in the *Macbeth-Evans Case, supra,* refers to the same remarks (246 Fed. 705) as follows:

" We therefore cannot think that the rule laid down in *Pennock* v. *Dialogue* and *Kendall* v. *Winsor* was intended to be qualified by the remarks of Mr. Justice Clifford in *Bates* v. *Coe* . . . We are confirmed in this by the reference made in *Bates* v. *Coe* . . . to the decision in *Pennock* v. *Dialogue* and to the effect of the legislation enacted since, and particularly by the view expressed by

the same justice ·while sitting on the circuit in *Jones* v. *Sewall,* 3 Cliff. 563, 592, 593—Fed. Cas. No. 7,495 where, in distinguishing between the intent to be inferred from experimental practice of an invention and practice for gain, he said:

" ' Such an· inference (of intention to surrender the invention to the public) is never favored, nor will it in general be sufficient to prove such a defense, unless it appears that the use, exercise, or practice of the invention was somewhat extensive, and for the purpose of gain, evincing an intent on the part of the inventor to secure the exclusive benefits of his invention without· applying for the protection of letters patent.' "

We concur in these explanations and qualifications of Mr. Justice Clifford's general remarks in *Bates* v. *Coe,* and for the reasons given. They certainly should not be construed to militate against our conclusion in this case and the reasons upon which it is founded.

Counsel for the appellants relies chiefly on the cases of *Smith* v. *Goodyear Dental Vulcanite Co.,* 93 U. S. 486; *Colgate* v. *Western Union Telegraph Co.,* 6 Fed. Cases, p. 85, and *United States* v. *American Bell Telephone Co.,* 167 U. S. 224, known as the *Berliner Case.* The first two cases have no bearing on this case. In them, the Court. found as a fact that the delays of the inventor in prosecuting his claims in the Patent Office after rejection were not due to an intention to abandon but to his necessitous circumstances. In the *Berliner Case* there was also a question of fact but a different one. The Government charged in that case, as it is charged here, that the Telephone Company, the owner of the invention, deliberately delayed proceedings in the Patent Office for thirteen years in order that, when its main Bell patent expired, the patent for the indispensable Berliner device might overlap and continue the monopoly as a whole. A reading of Mr. Justice Brewer's opinion in that case shows that the at-

tention of the Court was chiefly directed to the issue whether as a fact the delay was due to the design of the owner of the invention or to circumstances over which it had no control, including the rules of the Patent Office, the delays of the examiners, and the peculiar situation as to applications for patents in that active field of invention. The Court found this issue against the Government and in favor of the patentee, whose patent the Government was attempting to cancel for this fraud and could only cancel by clear and convincing proof. In the case at bar, the design of the inventor is disclosed by his own avowal, and his plan of non-action was not in accord with the rules of procedure in the Patent Office but was in plain violation of the statutory law.

The conclusion that Woodbridge forfeited his right to a patent by his delay in taking it from 1852 to 1862 makes it unnecessary for us to consider whether he abandoned it by his wholly unexplained delay of nine more years in prosecuting his appeal from the decision of the Board of Examiners, in July, 1862, to the Commissioner of Patents, until January, 1871. It also relieves us from going into the question whether the Government's use of subsequent patents for improvements in adjusting projectiles for firing from cannon embraced the invention of Woodbridge as contained in his specifications and claims allowed in 1852.

The judgment of the Court of Claims dismissing the petition is

*Affirmed.*