SPECIAL EQUIPMENT CO. v. COE, Commissioner of Patents.

No. 8466.

United States Court of Appeals
District of Columbia.

Argued Nov. 2, 1943.

Decided June 19, 1944.

Writ of Certiorari Granted Nov. 6, 1944.

See 65 S.Ct. 120.

Mr. Curtis F. Prangley, of Chicago, Ill., with whom Messrs. James M. Graves and Ballard Moore, both of Washington, D. C., were on the brief, for appellant.

Mr. E. L. Reynolds, of Washington, D. C., with whom Mr. W. W. Cochran, Solicitor, United States Patent Office, of Washington, D. C., was on the brief, for appellee.

Before MILLER, EDGERTON, and ARNOLD, Associate Justices.

ARNOLD, Associate Justice.

The alleged invention in this case is a machine which automatically cuts, peels and cores pears for canning. It consists of (1) a revolving turret in which the tops of the pears are "bobbed" or cut off, (2) a mechanism which transfers them to a splitting knife which cuts them in half, and (3) a second revolving turret in which the halved pears are peeled and cored. The machine has been highly successful. It has made it possible to double the annual pear pack since 1931 and materially reduced the cost of canned pears. About eighty per cent of all pears canned are prepared by this machine. A patent has been allowed on the entire machine.

This appeal is taken from the rejection of claims for a subcombination of the parts of a machine omitting the cutting knife. For convenience we will refer to the machine without the cutting knife as the partial machine, and the machine with the cutting knife as the complete machine. The trial court rejected the claims in effect

because they did not represent a true subcombination. It found that the cutting knife was an essential element to produce a useful result. It concluded, therefore, that the machine without the cutting knife was not the invention which was disclosed in the application, and that claims which left out the cutting knife did not actually describe the invention.

If it be true (1) that the subcombination does not produce a useful result, and (2) that only one invention is disclosed, to wit: the complete machine, the refusal of the subcombination claims here is justified. However, these propositions rest on a very slender foundation. In answering them the plaintiff showed motion pictures of the subcombination in actual operation without the cutting knife. It was clear that the result was far more useful than the old method of preparing fruit by hand. The only basis for the argument that the result was not useful rests on the fact that the work was done much better by the complete machine. In such twilight cases there is no real test whether or not the application discloses one invention or two distinct inventions. In this case it seems more plausible to say that the subcombination does produce a useful result and that two distinct inventions are disclosed in the application.

However, we need not decide this question because even if we take appellant's contention at its face value and assume that the claims for the subcombination present a distinct and useful invention, nevertheless we believe that a patent on that invention should be denied. The reason is that appellant's purpose in making a distinct patent claim on the subcombination is not to stimulate the commercial development or financial return from that patent. Instead, the record shows that it is to be used to exploit and protect the patent monopoly of another related invention, to wit: the complete machine. There is no intention to make or license others to make the partial machine because, although it is possible to use it without the cutting knife, it is not designed for such independent use. It is only an artificial and clumsy substitute for the complete machine. It requires that the fruit first be cut in half and then the

two halves joined together by hand before they are inserted. There is no rhyme or reason for manufacturing such a partial machine when there is available the complete machine which does the cutting mechanically.

The only real value of a patent on this subcombination is to protect the patent on the complete machine. How important that protection may be in this case we cannot ascertain. Theoretically if the complete machine is adequately described in the specifications the sub-patent is not needed at all. If someone develops a new machine that imitates appellant's machine too closely it will infringe the principal patent and the subcombination claim will be superfluous.

But the principle involved in approving patent claims whose only purpose is to protect other patent claims has far-reaching consequences.

It is a common technique, in what has become the organized business of getting patents, to surround a single invention with a number of patented claims on parts or aspects of that invention which the applicant has no intention of manufacturing or exploiting as distinct patents.[1] These are often called blocking or fencing patents. A good illustration of the idea we are trying to express is found in a memorandum of patent policy of a large concern investigated by the Temporary National Economic Committee, which reads as follows:

"In taking out patents we have three main purposes—

"(a) To cover the actual machines which we are putting out, and prevent duplication of them. * * *

"(b) To block the development of machines which might be constructed by others for the same purpose as our machines, using alternative means. * * *

"(c) To secure patents on possible improvements of competing machines, so as to 'fence in' those and prevent their reaching an improved stage. * * *"[2]

Another example of the same policy is found in the testimony of Mr. Charles Kettering before the Temporary National Economic Committee, who explained the practice as follows:

---

[1] Cf. the use of a process patent to extend the monopoly of another patent in Ethyl Gasoline Corp. v. United States, infra note 8.

[2] Hearing, Temporary National Economic Committee, Investigation of Concentration of Economic Power, Part 2, p. 776 (Exhibit No. 125) (1939); 75th Cong., 3d Sess.

"Sometimes there are half a dozen ways of doing a thing after you start to do it. When you put your money on that way, you take out these auxiliary patents as sort of protective things you didn't find yourself, and I think that is all right, too."[3]

These, of course, are only examples—which may or may not have influenced this particular appellant—to illustrate the dangers inherent in the granting of blocking and fencing patents. The record does not show that appellant here expects to use its fencing claim aggressively. It may well be that its purpose is protection against the aggressive use of similar patents by others. Yet if this be so it is only another illustration of the danger of allowing such claims as distinct inventions. Once that practice is established claims multiply in all directions. The fact that some use them for aggression compels others to demand them for protection. The result of granting blocking or fencing patents is to create a maze of patent restrictions whose effect is to confuse and impede business competitors and inventors and to entrench some one corporation in the position of domination over an industrial technique.

█ In the absence of controlling decisions on this subject it would seem apparent that to grant a patent for the purpose of blocking the development of machines which might be constructed by others is a violation of the constitutional provision that the patent law must promote science and the useful arts. Const. art. 1, § 8, cl. 8. The dangers of approving a principle which permits a patent monopoly to be extended by granting claims on distinct inventions, which the applicant has no intention of exploiting as distinct inventions, are apparent in the growth of modern monopolies based on patent control. Such patents are invalid for the same reason which condemns broad and misleading claims. That principle, as stated by Mr. Justice Bradley as early as 1872, is to protect the public from "ingenious attempts * * * to discourage further invention in the same department of industry * * *."[4]

The blocking or fencing patent is actually an ingenious device to broaden the scope of the invention beyond the article or process which is actually intended to be manufactured or licensed, and thus comes within the principle of the rule laid down by Mr. Justice Bradley.

At one time the reasoning of the Paper Bag case[5] could be used to support the present attempt to obtain one patent claim for the purpose of protecting another. In that case the defendant argued that the equitable remedy of injunction against infringement should be denied because of the plaintiff's "unreasonable non-use" of the patent. Plaintiff did not manufacture and declined to license the patent in question, in order to protect his investment in another patented machine with which the suppressed patent competed. This use of the patent to aid in the exploitation of another patent was approved in the opinion. The only qualification was a suggestion that a different result might be reached had the evidence shown "a question of diminished supply or of increase in prices."

From this decision it might be argued that a patent should be granted even if it appeared that the applicant's purpose was not to manufacture but to protect another patent. If the use of the patent to suppress manufacture is proper, then the grant of a patent for that purpose may be equally proper. The fact that the Paper Bag case involved infringement is a distinction without a difference.

We do not follow the reasoning of the Paper Bag case because we believe that its principle, which is inconsistent with the constitutional provision that the patent law "promote science and the useful arts," has been overruled by subsequent decisions. Indeed, it was the growth of monopoly restrictions which followed it that blew up the Paper Bag case till it burst. The Paper Bag case was decided at a time when, according to the Button Fastener case,[6] it was supposed to be lawful to enlarge the scope of the patent monopoly by means of a tying clause to enable the patentee to control the price of unpatented articles used with the patent. The Paper Bag opinion rests largely on language taken from the Button Fastener case.

But, in 1917, in Motion Picture Patents Co. v. Universal Film Mfg. Co.,[7] the Su-

3 Ibid., p. 345.

4 Carlton v. Bokee, 1872, 17 Wall. 463, 471, 472, 21 L.Ed. 517.

5 Continental Paper Bag Co. v. Eastern Paper Bag Co., 1908, 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122.

6 Heaton-Peninsular Button-Fastener Co. v. Eureka Specialty Co., 6 Cir., 1896, 77 F. 288, 35 L.R.A. 728.

7 1917, 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann.Cas. 1918A, 959.

preme Court overruled the cases which had formerly approved the use of a patent to control unpatented materials. The principle enunciated in the Motion Picture Patents case is broad enough to overrule the Paper Bag case. We can see no difference in principle between refusal to license unless unpatented materials are also taken (the practice condemned in the Motion Picture Patents case), and refusal to license or manufacture which was sustained in the Paper Bag case. The ultimate purpose is the same, the exploitation of a product outside the scope of the patent monopoly, and the means are the same, positive manipulation of the patent. In both cases the patentee has consciously framed a policy to so use his patent grant as to secure enhanced business advantages in a sphere which has no connection with the development of the particular invention which is patented. We find no valid distinction between using a patent to exploit the business of selling unpatented materials and using it to exploit another invention or to promote a general business policy. Nevertheless, the Paper Bag case continued to be cited by courts until the decision in Ethyl Gasoline Corp. v. United States.[8]

In the Ethyl case the defendant in an antitrust prosecution owned several patented claims related to the same basic invention, an anti-knock motor fuel. One claim was for the fluid, tetra-ethyl lead. Another patent claim covered the mixture of that fluid and gasoline. The defendant's sole revenue came from the sale of the patented fluid. The mixture patent was used to aid the eploitation of the fluid patent. The Court struck down Ethyl's system of exploitation. In the portion of his opinion headed "Scope of the Patent Monopoly" Mr. Justice Stone said:

" * * * Such benefits as result from

control over the marketing of the treated fuel by the jobbers accrue primarily to the refiners and indirectly to appellant, only in the enjoyment of its monopoly of the fluid secured under another patent. The licensing conditions are thus not used as a means of stimulating the commercial development and financial returns of the patented invention which is licensed, but for the commercial development of the business of the refiners and the exploitation of a second patent monopoly not embraced in the first. The patent monopoly of one invention may no more be enlarged for the exploitation of a monopoly of another, see Standard Sanitary Mfg. Co. v. United States, supra, [226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107], than for the exploitation of an unpatented article, United Shoe Machinery Co. v. United States, supra, [258 U.S. 451, 462, 42 S.Ct. 363, 367, 66 L.Ed. 708]; Carbice Corporation v. American Patents Corp., supra, [283 U.S. 27, 31, 51 S.Ct. 334, 335, 75 L.Ed. 819]; Leitch Manufacturing Co. v. Barber Co., supra, [302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371]; American Lecithin Co. v. Warfield Co., 7 Cir., 105 F. 2d 207, or for the exploitation or promotion of a business not embraced within the patent. Interstate Circuit, Inc., v. United States, supra, 306 U.S. [208] at pages 228-230, 59 S.Ct. [467] at pages 475, 476, 83 L.Ed. 610."[9]

We believe this language finally overrules what was left of the Paper Bag case. It declares that a patent can neither be used to protect another patent nor for the commercial development of other business of the patentee. Its proper function is limited to the development of the article or process covered by the claim. This conclusion is clearly the only one consistent with the constitutional mandate.[10] And this conclusion would clearly forbid the ap-

[8] 1940, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852.

[9] Ibid., 309 U.S. at page 459, 60 S.Ct. at page 626, 84 L.Ed. 852.

[10] Motion Picture Patents Co. v. Universal Film Mfg. Co., 1917, 243 U.S. 502, 510-511, 37 S.Ct. 416, 418, 61 L. Ed. 871, L.R.A.1916E, 1187, Ann.Cas. 1918A, 959:

"3d. Since Pennock v. Dialogue, 2 Pet. 1, 7 L.Ed. 327, was decided in 1829, this court has consistently held that the primary purpose of our patent laws is not the creation of private fortunes for the owners of patents, but is 'to promote the progress of science and the useful arts' (Constitution, art. 1, § 8), —an object and purpose authoritatively expressed by Mr. Justice Story, in that decision, saying:

" 'While one great object [of our patent laws was, by holding out a reasonable reward to inventors and giving them an exclusive right to their inventions for a limited period, to stimulate the efforts of genius, the main object was "to promote the progress of science and useful arts." '

"Thirty years later this court, returning to the subject, in Kendall v. Winsor, 21 How. 322, 16 L.Ed. 165, again pointedly and significantly says:

plicant here to use his patent, if granted, to enlarge the scope of the patent on the complete machine and to exploit and secure the business carried on in connection with that patent.

■ It follows that a patent claim should not be granted where it appears that the patentee expects to use it not for manufacture and sale but to protect another patent claim. If the record shows that the patent claim is made for the unlawful purpose of protecting another patent it is an unlawful patent. This does not mean that the applicant must guarantee production of the article or process covered by the claim. It is impossible to guess the utility or commercial success of any patent, and non-use standing alone is not a positive illegal use.[11] It does mean that the applicant must have some expectation of exploiting his patent if he can, rather than using it for purposes condemned in the Ethyl case. To hold otherwise is to suggest that the Patent Office furnish the opportunity for future illegal restraints of trade.

The best protection against the issuance of blocking or fencing patents would be to require the applicant to set out the real purpose for which the claim was made. Such a rule would require evidence of intention to stimulate the commercial development and financial returns of the particular invention covered by the claim, and a negative showing that its purpose was not to protect some other patent or claim. At present no such inquiry is made by the Patent Office (perhaps on account of the Paper Bag decision) but its absence does not justify the court in ignoring a blocking purpose which, as in this case, is clear on the face of the record.

It should be noted that this decision does not deprive appellant of a reward for his ingenuity in devising the mechanism set out in the subcombination claims. All it does is to deprive him of a distinct patent right in that subcombination standing by itself. The same subcombination mechanism is set out in the claims on the complete machine which have been allowed. These claims which have been allowed on the complete machine are obviously not inventions distinct from each other but different ways of describing the single invention of the complete machine.[12] They, therefore, establish no distinct patent rights but instead only outline the scope of the principal invention.

It is obvious that the more distinct patent rights an inventor can get on the parts of a machine the more power he has to handicap the inventive ingenuity of others who may use these same parts in more original ways. The question of how many distinctly patentable parts there are in a patent on a whole can never be determined with any certainty through the process of logic or analysis. It seems, therefore, a safe, practical test to limit the number of distinct patent rights in a single machine to those which the inventor expects to exploit separately, and not to suppress.

[11] As was said by Judge Aldrich, sitting in the Circuit Court of Appeals, in his dissenting opinion in Continental Paper Bag Co. v. Eastern Paper Bag Co., 1 Cir., 1906, 150 F. 741, 745:

"Simple nonuse is one thing. Standing alone, nonuse is no efficient reason for withholding injunction. There are many reasons for nonuse which, upon explanation, are cogent, but when acquiring, holding, and nonuse are only explainable upon the hypothesis of a purpose to abnormally force trade into unnatural channels—a hypothesis involving an attitude which offends public policy, the conscience of equity, and the very spirit and intention of the law upon which the legal right is founded—it is quite another thing."

" 'It is undeniably true, that the limited and temporary monopoly granted to inventors was never designed for their exclusive profit or advantage; the benefit to the public or community at large was another and doubtless the primary object in granting and securing that monopoly.'

"This court has never modified this statement of the relative importance of the public and private interests involved in every grant of a patent, even while declaring that, in the construction of patents and the patent laws, inventors shall be fairly, even liberally, treated. Grant v. Raymond, 6 Pet. 218, 241, 8 L.Ed. 376, 384; Winans v. Denmead, 15 How. 330, 14 L.Ed. 717; Walker, Patents, § 185."

[12] Rule 41 of the Patent Office reads in part as follows: " * * * where several distinct inventions are dependent upon each other and mutually contribute to produce a single result they may be claimed in one application: * * *" However, in a large number of cases the theory that the different claims are distinct inventions is pure fiction. The court must recognize that such claims often do not create distinct patent rights.

Distinct patent rights should not be granted for the sole purpose of handicapping future inventors whose discoveries would not otherwise infringe the complete patent.

I fully agree with the concurring opinion of Mr. Justice Miller which states the same principle with a slightly different emphasis.

For these reasons the judgment of the court below will be

Affirmed.

MILLER, Associate Justice (concurring).

I concur fully in Justice ARNOLD's opinion. Its implications are far-reaching. They will require a considerable reexamination—if not readjustment—of Patent Office practices and procedures, especially with respect to subcombination claims. For these reasons I wish to spell out in greater detail my analysis of the questions involved.

In the present case we have typical subcombination claims. There is no lack of completeness or clarity in them; they specifically point out what is claimed as an invention and it would not be difficult to construct the subcombination from the drawings. The notion that the bobbing operation cannot take place after the pear has been split by hand ignores the texture and character of canning pears. The suggestion that the subcombination is inoperative when the pear is pre-split by hand is directly contrary to the evidence, particularly to the incontrovertible evidence of the motion picture which was displayed to this court as well as to the trial court. The notion that the inventor must have thought only in terms of splitting as an intermediate process, ignores the long history of pear canning as a hand process, and the inescapable fact that one who was experimenting in this area must have tried a variety of arrangements until he found the one most adapted to his purpose. Considered in terms of the older practices in pear canning the subcombination machine, standing alone, represented a tremendous advance, and, in operation, would result in great saving of manpower, of time, of working space, and of the more primitive equipment formerly used. The record makes these facts apparent beyond question. But the suggestion of the Patent Office—expressed in the opinion of its Board of Appeals—"that the claims as drawn * * * cover constructions never contemplated by applicant" opens up the question whether these claims, which were filed by the inventor's assignee seven years after the original application, were actually intended to describe an invention, or whether they were intended, improperly, to fence and block an area of investigation and research, solely to protect the main invention, by suppressing use, or further discovery in this area.

Where, as here, such subcombination claims are filed by assignees, who are manufacturers and distributors rather than persons skilled in the art, the Patent Office is put on notice of the probability suggested. As a matter of fact, appellant freely admitted, both on argument and in its brief in the present case, that its purpose in filing the disputed claims was to "protect" the main invention and that it had no intention of manufacturing the subcombination machine. This brings us then to the questions, first, whether the purpose of the patent clause will be accomplished by granting a patent to cover such claims and, second, whether an applicant can compel the issuance of a patent under circumstances which reveal a purpose contrary to that of the Constitution.

The constitutional provision[1] involves two conflicting considerations: The first, "To promote the Progress of Science and useful Arts * * *"; the second, "securing for limited Times to Authors and Inventors the exclusive Right * * *" to their inventions. Consistently, judicial interpretation of this provision has declared its major purpose to be the promotion of science and the useful arts.[2] Some of the earlier cases, however, placed considerable emphasis upon the rights of the inventor, at the expense of the major constitutional purpose.[3] The most extreme example of

[1] U.S.Const. Art. I, § 8, Cl. 8.

[2] Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 510, 511, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A. 1917E, 1187, Ann.Cas.1918A, 959; Warner v. Smith, 13 App.D.C. 111, 114; Woodbridge v. United States, 263 U.S. 50, 55, 44 S.Ct. 45, 68 L.Ed. 159; United States v. Univis Lens Co., Inc., 316 U.S. 241, 250, 62 S.Ct. 1088, 86 L.Ed. 1408; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 492, 62 S.Ct. 402, 86 L. Ed. 363; Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 665, 64 S. Ct. 268.

[3] United States v. American Bell Tel. Co., 167 U.S. 224, 250, 17 S.Ct. 809, 814, 42 L.Ed. 144: "Counsel seem to argue·

this comparative emphasis appears in the Button-Fastener case,[4] decided in 1896 by a circuit court of appeals composed of Taft, Lurton and Hammond: "Especially is this caution applicable when we sit in judgment upon the limitations which a patentee may put upon the use of his invention. If he see fit, he may reserve to himself the exclusive use of his invention or discovery. If he will neither use his device, nor permit others to use it, *he has but suppressed his own.*" [Italics supplied] But even in the Button-Fastener case the Court recognized the weight of the countervailing consideration; although it refused on that account to limit the patentee's monopoly. It said: "That the grant is made upon the reasonable expectation that he will either put his invention to practical use, or permit others to avail themselves of it upon reasonable terms, is doubtless true. This expectation is based alone upon the supposition that the patentee's interest will induce him to use, or let others use, his invention. The public has retained no other security to enforce such expectations."[5] In the Supreme Court cases the proposition was never pushed so far. That Court was content to define the limits of

the patentee's monopoly in terms of nonuser,[6] rather than of suppression.

The applicable statute has, from the beginning, spoken in terms of "making, constructing, using, and vending."[7] Here was an interposition of governmental control, pursuant to the Constitution, over an area of property rights formerly regulated by principles of the common law. A persuasive analogy may be found in the water law of the Western States; which permits an owner of land to secure, by prior appropriation, rights in running water—against the Government or the erstwhile riparian owner—but limits those rights in terms of his continuing, beneficial use. As pointed out in the majority opinion, the Supreme Court, in the Motion Picture Patents case, rejected the extreme doctrine of the Button-Fastener case, and in doing so stated that the defect in the reasoning of the latter case sprang in part from substituting "inference and argument for the language of the statute." It rejected the argument that "since the patentee may withhold his patent altogether from public use, he must logically and necessarily be permitted to impose any conditions which he chooses upon any use which he may al-

---

that one who has made an invention, and thereupon applies for a patent therefor, occupies, as it were, the position of a quasi trustee for the public; that he is under a sort of moral obligation to see that the public acquires the right to the free use of that invention as soon as is conveniently possible. We dissent entirely from the thought thus urged. The inventor is one who has discovered something of value. It is his absolute property. He may withhold the knowledge of it from the public, and he may insist upon all the advantages and benefits which the statute promises to him who discloses to the public his invention." Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 429, 28 S.Ct. 748, 756, 52 L. Ed. 1122: "As to the suggestion that competitors were excluded from the use of the new patent, we answer that such exclusion may be said to have been of the very essence of the right conferred by the patent, as it is the privilege of any owner of property to use or not use it, *without question of motive.*" [Italics supplied] Crown Die & Tool Co. v. Nye Tool & Machine Works, 261 U. S. 24, 34, 43 S.Ct. 254, 67 L.Ed. 516. See United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97, 98, 39 S.Ct. 48, 63 L.Ed. 141. Cf. Fox Film Corp.

v. Doyal, 286 U.S. 123, 127, 52 S.Ct. 546, 76 L.Ed. 1010.
[4] Heaton-Peninsular Button-Fastener Co. v. Eureka Specialty Co., 6 Cir., 77 F. 288, 294, 295, 35 L.R.A. 728.
[5] Ibid.
[6] Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 429, 430, 28 S.Ct. 748, 756, 52 L.Ed. 1122: "We have seen that it has been the judgment of Congress from the beginning that the sciences and the useful arts could be best advanced by giving an exclusive right to an inventor. The only qualification ever made was against aliens, in the act of 1832. * * * It is manifest, as is said in Walker on Patents, § 106, that Congress has not 'overlooked the subject of nonuser of patented inventions.' And another fact may be mentioned. In some foreign countries the right granted to an inventor is affected by nonuse. This policy, we must assume, Congress has not been ignorant of nor of its effects. It has, nevertheless, selected another policy; it has continued that policy through many years. We may assume that experience has demonstrated its wisdom and beneficial effect upon the arts and sciences." See cases cited in note 3 supra.
[7] 1 Stat. 318, 321, 35 U.S.C.A. § 40.

low of it." [8] In the Standard Sanitary Manufacturing Co. case,[9] the Court said: "Rights conferred by patents are indeed very definite and extensive, but they do not give any more than other rights an universal license against positive prohibitions. The Sherman law is a limitation of rights, rights which may be pushed to evil consequences, and therefore restrained." The language of the Ethyl case is even more far-reaching.[10]

Generally speaking, the patentee may not enlarge his monopoly or acquire some other which the statute and the patent together did not give.[11] Public policy forbids the use of a patent to secure an exclusive right or limited monopoly not granted by the Patent Office and which it is contrary to public policy to grant.[12] The limits of the patent are narrowly and strictly confined to the precise terms of the grant. It is the public interest which is dominant in the patent system.[13] In the Univis case,[14] the Supreme Court stated the general principle as follows: "In construing and applying the patent law so as to give effect to the public policy which limits the granted monopoly strictly to the terms of the statutory grant, * * * *the particular form or method by which the monopoly is sought to be extended is immaterial."* [Italics supplied]

This reasoning would seem to be equally applicable to the situation of the present case as to an infringement case or to an antitrust proceeding. The same considerations of public policy are present; the same major purpose of the Constitution and statute are involved. In fact, the preliminary inquiry of the Patent Office would seem to be the most appropriate occasion of all to investigate and determine whether the intent and purpose of the applicant is consistent with the major purpose of the Constitution and with the public policy. If we assume, as the Supreme Court has held, that (1) the patent monopoly of one invention may not be enlarged for the exploitation of the monopoly of another patent; (2) public policy forbids the use of a patent to secure a monopoly which it is contrary to public policy to grant; (3) the particular form or method by which the monopoly is sought to be extended is immaterial; and if we assume, further, that the purpose and intent of the applicant for a subcombination claim is to violate each of the first three assumptions, why should a patent be granted for the subcombination claim? In such a situation why should it be necessary to license an applicant to violate the law, only to subject him to prosecution when, later, he does violate it?

The logical result, therefore, of the later Supreme Court cases is to forbid the granting of a patent where the purpose of the applicant is clearly revealed to suppress manufacture or use in order to extend the monopoly of another patent or in order to achieve any other objective violative of the law and of the public policy. Whether this result requires, in the Patent Office, procedure to compel an affirmative showing of purpose by each applicant, it is not necessary to determine in the present case. Here, the chronology of the case in the Patent Office suggests, and the admission of appellant confirms, a purpose contrary to the purpose of the Constitution and statute, with respect to the disputed subcombination claims.

This result flows, also, as pointed out in the majority opinion, from the logic of cases forbidding the patenting of broad and misleading claims. The use of many claims to describe an invention, and of sub-

[8] Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 514–516, 37 S.Ct. 416, 420, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann.Cas.1918A, 959.

[9] Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 49, 33 S.Ct. 9, 15, 57 L.Ed. 107.

[10] Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 459, 60 S.Ct. 618, 625, 84 L.Ed. 852.

[11] Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 456, 457, 60 S.Ct. 618, 625, 84 L.Ed. 852: "He may not, by virtue of his patent, condition his license so as to tie to the use of the patented device or process the use of other devices, processes or materials which lie outside of the monopoly of the patent licensed; * * * or condition the license so as to control conduct by the licensee not embraced in the patent monopoly * * *; or upon the maintenance of resale prices by the purchaser of the patented article."

[12] Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 492, 62 S.Ct. 402, 86 L.Ed. 363.

[13] Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 665, 64 S.Ct. 268.

[14] United States v. Univis Lens Co., Inc., 316 U.S. 241, 251, 252, 62 S.Ct. 1088, 1094, 86 L.Ed. 1408.

combination claims to describe what purport to be parts of the main invention, may be merely an expedient for avoiding the prohibition against too broad and misleading claims; i.e., to include unpatentable, or to hedge in undiscovered, devices or methods. When the use of such an expedient seems apparent or probable, then the same rules, as those governing too broad or misleading claims, should be applied. But the application of those rules, to be effective, must be made upon the whole aggregation of claims, not upon each claim separately. This is as true of proceedings under Section 4915 as of proceedings in the Patent Office. The reason for this appears clearly in the present case. Here the subcombination claims, standing alone, describe a useful machine. But, when that machine is compared with the one revealed by the main invention claims, its utility is lessened, to say the least; and the subcombination claims become suspect. Frank admission of intention to suppress the subcombination for the purpose of *protecting* the main invention completes the picture.

In this case the subcombination claims were not filed by the inventor but by the assignee seeking to enlarge the scope of a purchased invention. Particularly in such cases the Patent Office should be alert to inquire into the purpose which inspires the filing of such claims and should require at least a prima facie showing of reasonable expectation that the device, or process described therein, will be used or permitted to be used.

Finally, the same public policy is reflected in the rule which invalidates a patent if the claim upon which it is based is for more than the applicant invented. In the Marconi case, the Court said: "The purpose of the rule that a patent is invalid in its entirety if any part of it be invalid is the protection of the public from the threat of an invalid patent, and the purpose of the disclaimer statute is to enable the patentee to relieve himself from the consequences of making an invalid claim if he is able to show both that the invalid claim was inadvertent and that the disclaimer was made without unreasonable neglect or delay."[15] The threat to the public, of an invalid patent, should not be encouraged by a too casual inquiry at its inception. The protection of the public should not be required to await the initiation of an infringement suit or an antitrust prosecution.

Mr. Justice EDGERTON concurs in both the foregoing opinions.

---

[15] Marconi Wireless Telegraph Co. v. United States, 320 U.S. 1, 58, 63 S.Ct. 1393, 1419, 87 L.Ed. 1731.