RAMBUS, INC., Plaintiff,

v.

INFINEON TECHNOLOGIES AG, et al., Defendants.

No. 3:00CV524.

United States District Court, E.D. Virginia, Richmond Division.

Aug. 12, 2004.

---

10. Plaintiff also may pursue these claims in state court, if it so chooses.

Michael W. Smith, Esquire, Craig T. Merritt, Esquire, R. Braxton Hill, Esquire, Christian & Barton, L.L.P., Richmond, VA, Gregory P. Stone, Esquire, Peter A. Detre, Esquire, Munger, Tolles & Olson LLP, Los Angeles, CA, for Plaintiff.

Brian C. Riopelle, Esquire, Robert M. Tyler, Esquire, McGuire Woods, LLP, Richmond, VA, John M. Desmarais, Esquire, Gregory S. Arovas, Esquire, Michael P. Stadnick, Esquire, Kirkland & Ellis, New York City, for Defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

This matter is before the Court on Rambus, Inc.'s ("Rambus") Motion *in Li-mine* No. 2, to Exclude Evidence or Argument that Plaintiff's Amendment of Patent Claims was Based on Stolen Ideas or was Otherwise Wrongful or Illegal (Docket No. 576). The Defendants are Infineon Technologies AG, Infineon Technologies North America Corporation, and Infineon Technologies Holding North America, Incorporated (hereinafter collectively "Infineon"). By way of this motion *in limine*, Rambus asks the Court to preclude Infineon from introducing evidence or presenting argument that Rambus' amendment of its patent claims was based on ideas acquired from documents produced and discussions conducted during the process of the development of an industry standard by a standard-setting organization, the Joint Electronics Devices Engineering Council ("JEDEC"). Infineon offers that conduct as one component of its proof to show that Rambus violated the federal antitrust law, 15 U.S.C. § 2, and the California unfair trade practice statute, Cal. Bus. & Prof.Code § 17200. Relying on the decision of the United States Court of Appeals for the Federal Circuit in *Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867 (Fed.Cir. 1988), and its progeny, Rambus asserts that Infineon is entirely foreclosed from offering such evidence or making any such arguments.[1] For the reasons explained below, the motion *in limine* will be denied.

## STATEMENT OF FACTS

Founded in March 1990, Rambus develops, secures patents on, and licenses technologies to companies that manufacture semiconductor memory devices. Rambus is not a manufacturing company and thus it relies on the licensing of its patent portfolio for revenue.

---

1. Quite obviously, if the evidence is not admissible, Infineon cannot present argument about it. Hence, the real issue is whether the evidence is admissible.

In 1990, Rambus filed United States Patent Application Serial Number 07/510,-898 (the "898 application") with claims directed to dynamic random access memory, or "DRAM" technology. The United States Patent and Trademark Office ("PTO") determined that the application covered several independent inventions. Consequently, the PTO issued an eleven-way restriction requiring Rambus to elect one invention to pursue in its application. In response, Rambus filed numerous divisional and continuation applications assertedly based on its original application. Thereafter, Rambus was awarded numerous DRAM patents. According to Rambus, these patents are directed to several DRAM-related technologies: Rambus DRAM ("RDRAM"), Synchronous Dynamic Random Access Memory ("SDRAM"), and Double Data Rate Synchronous Dynamic Random Access Memory ("DDR–SDRAM").[2] Among those patents are the four patents-in-suit: United States Patent Nos. 5,954,804 (the " '804 patent"), 6,034,-918 (the " '918 patent"), 5,953,263 (the " '263 patent"), and 6,032,214 (the " '214 patent").[3] These patents were issued in 1999 and 2000.

In August 2000, Rambus filed a complaint against Infineon, alleging infringement of all four of those patents. Before trial, the Court issued a Memorandum Opinion pursuant to *Markman v. Westview Instruments. Inc.*, 52 F.3d 967 (Fed. Cir.1995) (en banc), *aff'd* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), construing the disputed claim terms of the patents-in-suit. Thereafter, Rambus abandoned, before trial, the charge of infringement as to the '804 patent.

Thus, at trial, Rambus proceeded against Infineon as to the '263 patent, the '214 patent, and the '918 patent. During the trial, however, judgment as a matter of law ("JMOL") was granted in Infineon's favor respecting the alleged infringement of those patents. Consequently, a number of Infineon's affirmative defenses and counterclaims were no longer relevant, and therefore, some were abandoned, and others were dismissed without prejudice.

Among the counterclaims that went to verdict were those for actual and constructive fraud. The fraud claims were predicated, in part, on the theory that Rambus had violated certain patent disclosure policies of JEDEC[4] during the process by which JEDEC was establishing an industry standard for SDRAMs and later DDR–SDRAMs. As part of the evidence offered in connection with its fraud claims, Infineon introduced evidence that Rambus attended the JEDEC meetings first to try to get its RDRAM technology adopted as an industry standard and later for the purpose of learning about the proposed DRAM standards being developed there and then using that information to amend its pending patent applications and to file continuation and divisional applications intended to produce patents that, when issued, would encompass any technology made in compliance with the JEDEC

---

2. These technologies are described in some detail at *Rambus, Inc. v. Infineon Tech. AG*, 318 F.3d 1081, 1085 (Fed.Cir.2003). *See also Rambus, Inc. v. Infineon Tech. AG*, 164 F.Supp.2d 743, 747–48 (E.D.Va.2001). Broadly, a DRAM is a high-speed, short-term memory device where information being used by the central processing unit of a computer is temporarily stored.

3. As a result of the 2001 trial of this matter, as well as a motion for summary judgment of noninfringement on remand, the '804 patent and the '214 patent are no longer in play and will not be at issue at the upcoming trial.

4. JEDEC is affiliated with the Electronics Industries Association ("EIA"). *Rambus, Inc. v. Infineon Tech. AG*, 318 F.3d 1081, 1086 (Fed. Cir.2003).

SDRAM and DDR–SDRAMs standards. In other words, at trial, Infineon offered evidence that Rambus clandestinely used information that it had acquired at, and in connection with, JEDEC meetings to guide its patent prosecution so as to capture products made pursuant to the JEDEC standard and deliberately waited until after the DRAM industry had become "locked in" to producing products that complied with the JEDEC SDRAM and DDR–SDRAM standards to announce that the patents it had thusly procured covered the JEDEC standards.[5]

During closing arguments, Infineon's counsel argued, *inter alia:* "If they had invented it, it would have been in the patent in the first place, but they didn't. They stole it. They stole it from the industry standards bodies."[6] Counsel further argued: "They [Rambus] go to ... [JEDEC] meetings, they see the presentations .... They go meet with their patent lawyer, they start amending the claims."[7] And: "Did Rambus attend standards bodies meetings and change their patents to cover what they saw at the standards meetings? You can't reach any other conclusion."[8]

To rebut this evidence and defuse this line of argument, Rambus proffered a jury instruction based on *Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.,* 863 F.2d 867 (Fed.Cir.1988). In particular, Rambus offered an instruction based on the following language from that case:

> It should be made clear ... that there is nothing improper, illegal or inequitable in filing a patent application for the purpose of obtaining a right to exclude a

known competitor's product from the market; nor is it in any manner improper to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution.

*Kingsdown,* 863 F.2d at 874.

Finding that the instruction was neither accurate nor complete as respected the facts in evidence, the Court declined to give the jury instruction as tendered. Instead, the Court offered to give an instruction based on *Kingsdown* that made it apparent that, although it is not *per se* improper to amend patent claims in order to cover a competitor's product, it is not proper to violate the law in the course of obtaining the information that facilitates the amended filings. Specifically, the alternate instruction read as follows:

> It is not improper to amend or add patent claims intended to cover a competitor's product about which the applicant has learned during the prosecution of the patent application, including a continuation or divisional patent application, provided that the claims are supported by the original patent application ... [and] provided that the added or amended claims are not based on information obtained by engaging in wrongful conduct.

*Rambus, Inc. v. Infineon Tech. AG,* 164 F.Supp.2d 743, 774 (E.D.Va.2001). Rambus, however, declined the Court's offer to give this alternate instruction. *Id.*

Ultimately, the jury found Rambus liable on Infineon's counterclaim for actual and constructive fraud. The Court grant-

---

5. That same evidence was offered as part of Infineon's monopolization counterclaim that, for reasons not here pertinent, was dismissed without prejudice after JMOL was granted on the claims of Rambus that Infineon had infringed the patents-in-suit. That counterclaim is now back in the case on remand.

6. Trial Transcript, Vol. VIII, *Rambus, Inc. v. Infineon Tech. AG,* No. 3:00CV524, May 8, 2001, at 161.

7. *Id.* at 74.

8. *Id.* at 93.

ed Rambus' post-trial motion for JMOL as to the constructive fraud claim and as to that part of the actual fraud verdict that related to the DDR–SDRAM standard of JEDEC. *Rambus, Inc.,* 164 F.Supp.2d at 767. Rambus' post-verdict motion for JMOL on the fraud verdict as it related to the SDRAM standard was denied and judgment was entered on that verdict.

On appeal, the United States Court of Appeals for the Federal Circuit affirmed in part and reversed in part. *Rambus, Inc. v. Infineon Tech. AG,* 318 F.3d 1081, 1106 (Fed.Cir.2003). Respecting the fraud verdict, the court held that the JEDEC patent disclosure policy applied only to patent claims that reasonably read on or covered the standard under consideration by JEDEC and that, although Rambus wanted to obtain claims covering SDRAM standards, it · did not in fact obtain any SDRAM patent claims while it was a member of JEDEC. *Rambus, Inc.,* 318 F.3d at 1103–04. In reaching this conclusion, the Federal Circuit stated:

> The record shows that Rambus's claimed technology did not fall within the JEDEC disclosure duty. The record shows at most that Rambus wanted to obtain claims covering the SDRAM instead. Some of that evidence does not put Rambus in the best light. Rambus thought it could cover the SDRAM standard and tried to do so while a member of an open standards-setting committee. While such actions impeach Rambus's business ethics, the record does not contain substantial evidence that Rambus breached its duty under the EIA/JEDEC policy.

*Id.* at 1104. The Federal Circuit thereafter set aside the fraud verdict, reversed this Court's construction of five of the disputed claim terms contained in the patents-in-suit, and remanded the case for further proceedings.

The motion *in limine* under consideration is predicated on the fact that, in its Second Amended Answer and Counterclaims ("SAC"), filed after the remand, Infineon again alleges that Rambus improperly acquired the information that it used in amending its applications to secure the patents-in-suit and that the acquisition of that information was a part of Rambus' monopolistic conduct and unfair business practices. For instance, Infineon alleges that:

> Rambus utilized its participation in the JEDEC SDRAM standardization process to learn the direction of the SDRAM standardization, and to learn about the next generation DRAM called DDR–SDRAM. Unbeknownst to JEDEC and its members, Rambus then used that confidential information to amend its existing patent portfolio and to file new patent applications, which were divisions or continuations of its existing pending applications. This allowed Rambus to draft new claims that if interpreted as contended by Rambus covered the very SDRAM standards Rambus was helping JEDEC to standardize, and to cover the next generation DDR–SDRAM chips as well.

SAC, at 30 ¶ 94. The SAC states further:

> Rambus was slowly, secretly seeking to acquire an illegal monopoly by: secretly incorporating in its patent applications what it was learning at JEDEC meetings thereby building a patent portfolio to cover JEDEC's SDRAM and later DDR–SDRAM standards.

SAC, at 44 ¶ 146. In other words, Infineon continues to allege (and, notably, the evidence of record, if credited by a jury, herein would support a finding) that, after Rambus' efforts to have JEDEC adopt its RDRAM as the industry standard were unsuccessful, Rambus attended JEDEC meetings for the purpose of learning the standards that were to be adopted by the

DRAM industry and then steered its patent prosecution in such a way as to encompass products made in compliance with those standards. As proffered by Infineon, these contentions are pertinent to Infineon's counterclaim for monopolization, 15 U.S.C. § 2, as well as its counterclaim for unfair business practices under Cal. Bus. & Prof.Code § 17200. They also are relevant to some of Infineon's defenses.

Now, however, that the Federal Circuit has rejected the finding of fraud on the part of Rambus at JEDEC, Rambus argues that Infineon has no basis for arguing that Rambus' amendment of its patent claims was improper, wrongful, or illegal, whether standing alone or as part of Rambus' other conduct. In other words, by way of its Motion *in Limine* No. 2, Rambus argues that, now that fraud, on which this Court previously distinguished *Kingsdown*[9] and its application to this case is no longer in play, Infineon should be precluded from offering evidence that Rambus acquired, during the JEDEC standard-setting process, the information that it used to acquire its patents and to acquire monopoly power and to violate the unfair business practices law. Rambus also asks

that Infineon's counsel be precluded from arguing that Rambus stole the ideas that it used to acquire the patents-in-suit. In sum, says Rambus, any such argument or evidence would run afoul of the rule announced in *Kingsdown* (as interpreted by Rambus) and would undermine seriously Rambus' right to a fair trial. For the reasons stated below, Rambus' motion *in limine* will be denied.

## DISCUSSION

An understanding of *Kingsdown*, as well as its progeny, is necessary to resolution of Rambus' motion. Thus, the analysis of the motion will begin with an analysis of *Kingsdown*, as well as the four subsequent decisions of the Federal Circuit in which the at-issue portion of the *Kingsdown* decision has been applied.

### I. The Decision in *Kingsdown*

Kingsdown Medical Consultants ("KMC") filed a patent infringement action against Hollister, Inc. ("Hollister"), alleging that Hollister had infringed KMC's patents that covered a two-piece colostomy appliance. KMC filed its original application with the PTO in 1978. Over the next

9. In a post-trial Memorandum Opinion rejecting Rambus' contention that the failure to give its proffered *Kingsdown* instruction was in error, the Court analyzed *Kingsdown* generally and compared Rambus' proposed instruction with the instruction that the Court had offered to give:

> [T]he distinction offered in the Court's proffered version of the instruction is analogous to the exception mentioned in *Kingsdown*: "[a]ny such amendment or insertion must comply with all statutes and regulations." *Kingsdown*, 863 F.2d at 874. That text teaches that the instruction permitted by *Kingsdown* cannot be based on information obtained by engaging in wrongful conduct because that conduct is in violation of the law of fraud.... Even though Rambus is allowed, at some general level, to draft claims to cover a competitor's product, it cannot do so when that action would

breach a duty it incurred as result of being a member of a standard-setting body. The breach of that duty was based on a failure to disclose pending patent applications, not on Rambus' choice to amend its patents. *Rambus, Inc. v. Infineon Tech. AG*, 164 F.Supp.2d 743, 775 (E.D.Va.2001). That discussion reflected the fact that, at trial, the instruction offered by Rambus pertained only to the fraud claim. Infineon's monopolization claim had been dismissed without prejudice because JMOL had been granted on Rambus' patent infringement claims. *See* Unpublished Memorandum Opinion, *Rambus, Inc. v. Infineon Tech. AG*, 3:00CV524, (E.D.Va. July 21, 2004) (Docket No. 813). The monopolization claim is once again part of the case and, due to amendments on remand, so is a unfair business practices claim under California law. *Rambus, Inc. v. Infi-*

six years, a complex prosecution ensued, involving multiple submissions, rejections, amendments, and continuation applications.

At some point during this six year prosecution, KMC's patent attorney saw, apparently in the marketplace,[10] a two-piece colostomy device manufactured by Hollister, a competitor in the market. Thereafter, KMC filed a continuation application. In filing this continuation application, KMC submitted a two-column list, one column listing the claim numbers of twenty-two previously allowed claims and the other column listing the claim numbers of twenty-one new claims in the continuation application that corresponded to those previously allowed claims. In filing this list, however, KMC indicated, incorrectly, that claim 43 in the continuation application corresponded to claim 50 in the parent application (claim 50 in the parent application had already been allowed by the PTO). In reality, claim 43 in the continuation application corresponded to another claim that the PTO previously had rejected for indefiniteness. The PTO did not notice this error; and, eventually, a patent issued as a result of the continuation application. Thereafter, KMC sued Hollister for infringing this patent.

■ As a defense to KMC's infringement case, Hollister raised the defense of

inequitable conduct in the PTO.[11] And, the district court found that, by representing that claim 43 in the continuation application corresponded to allowable claim 50 in the parent application, KMC had provided false information to the PTO. The district court further found that KMC had submitted this information with the requisite deceitful intent, in part, because KMC's lawyer had viewed the Hollister device before filing the continuation application.

On appeal, the Federal Circuit reversed, in part, because it rejected the district court's finding of deceitful intent. In so doing, the Court of Appeals stated:

> It should be made clear ... that there is nothing improper, illegal or inequitable in filing a patent application for the purpose of obtaining a right to exclude a known competitor's product from the market; nor is it in any manner improper to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution. Any such amendment or insertion must comply with all statutes and regulations, of course, but, if it does, its genesis in the marketplace is simply irrelevant and cannot of itself evidence deceitful intent.

*Kingsdown,* 863 F.2d at 874 (citing *State Indus., Inc. v. A.O. Smith Corp.,* 751 F.2d 1226 (Fed.Cir.1985)).[12] The *Kingsdown*

neon *Tech. AG,* 304 F.Supp.2d 812 (E.D.Va. 2004).

**10.** The opinion does not specify where the competitor's product was seen. Rather, it says only that the "attorney saw [the competitor's product]." *Kingsdown,* 863 F.2d at 870. Later, however, the opinion refers to "its genesis in the marketplace." *Id.* at 874.

**11.** Inequitable conduct in the PTO requires (1) a failure to disclose material information to the PTO or the submission of false information to the PTO, done with (2) an intent to deceive the PTO. *J.P. Stevens & Co., Inc. v. Lex Tex Ltd.,* 747 F.2d 1553, 1559 (Fed.Cir.1984). Pursuant to a motion for summary judgment filed by Rambus, the Court, by way of Memo-

randum Opinion entered on July 21, 2004, dismissed Infineon's defenses of invalidity and unenforceability of the patents-in-suit for inequitable conduct in the PTO.

**12.** Although not cited by the Federal Circuit in *Kingsdown,* several district courts previously had made similar statements. *See Micro–Acoustics Corp. v. Bose Corp.,* 493 F.Supp. 356, 367 (S.D.N.Y.1980) ("There is nothing wrong with broadening the claims to cover competitive devices about which the applicant ... learns after the application is filed, so long as the claims are supported by the specification."); *Penn Yan Boats, Inc. v. Sea Lark Boats, Inc.,* 359 F.Supp. 948, 954–55 (S.D.Fla.1972) ("There is nothing inherently

decision, therefore, stands for the proposition that filing claims with the PTO in order to cover a competitor's product, standing alone, is not a sufficient basis for finding deceitful intent.

## II. Federal Circuit Decisions Subsequent to *Kingsdown*

After 1988, the Federal Circuit has returned on four occasions to the part of *Kingsdown* that is at issue here. First, a year after *Kingsdown*, the court decided *Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 871 F.2d 1054 (Fed. Cir.1989). Texas Instruments, Inc. ("TII") filed an administrative complaint with the United States International Trade Commission ("ITC") against Samsung Company, Ltd. ("Samsung") for importing into the United States various products which TII alleged to infringe certain of its patents. After a hearing, the administrative law judge ("ALJ") decided, among other things, that certain Samsung products did not infringe United States Patent No. 4,533,843 (the "'843 patent"). Subsequently, a full commission of the ITC affirmed this ruling. It was this full commission ruling that the parties appealed to the Federal Circuit.

The finding of non-infringement respecting the '843 patent largely obtained because of the ALJ's interpretation of the claim term "selected voltage." In reviewing the ALJ's decision, the Federal Circuit recounted somewhat the prosecution history of the '843 patent, specifically, the insertion of the claim term "selected voltage" by TII during the patent prosecution.

In TII's original patent application, TII did not employ the term "selected voltage," but rather the term "said voltage."

*Texas Instruments, Inc.*, 871 F.2d at 1064. After, however, TII filed the original application, MOSTEK Electronics ("MOSTEK") began manufacturing a competing product similar to that claimed by TII in its application. Thereafter, seeking broader claim coverage that would reach MOSTEK's competing product, TII filed a continuation application that substituted the words "selected voltage" for "said voltage." In so doing, TII informed the patent examiner that the original specification disclosed this newly claimed technology. Indeed, thereafter, the examiner did not object to the claims as interjecting "new matter" and issued eventually the '843 patent. *Texas Instruments, Inc.*, 871 F.2d at 1065; *see also* 35 U.S.C. § 132 ("No amendment shall introduce *new matter* into the disclosure of the invention.") (emphasis added).

The ALJ ruled that, in amending its claims, TII had in fact added "new matter" not supported by the original specification. The ALJ, however, preserved the validity of the claim by construing the amendment which changed "said voltage" to "selected voltage" as limited to a smaller subset of the claimed technology. *Texas Instruments, Inc.*, 871 F.2d at 1065. The Federal Circuit reversed the ALJ's decision, ruling that, although claims, whenever possible, should be read so as to preserve their validity, the ALJ, in imposing a preserving construction on TII's claim, impermissibly had rewritten the claim in order to add a limitation that the patentee had not included. *Id.* ("It was not permissible for the ALJ, in order to preserve the validity of the claims, to rewrite them to add a limitation that the

---

wrong or dishonest in amending claims in a pending application during the course of prosecution before the United States Patent Office in order to insure that the claims which ultimately appear in the issued patent will cover the commercial activity of third parties,

whose potentially infringing activities are discovered subsequent to the filing of a patent application, so long as the claims are supported by the original patent application disclosure.").

patentee had eliminated ... and then to hold that the challenged devices ... did not infringe the rewritten claims.").

However, before making that ruling (which is the holding in the case respecting the '843 patent), the Federal Circuit explained TII's conduct and the prosecution history of the '843 patent and then observed:

> Here Texas Instruments broadened the claim during prosecution to cover the competing MOSTEK [product]. It is not "improper to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution of a patent application."

*Id.* (quoting *Kingsdown,* 863 F.2d at 874). It is not entirely clear why that statement was made because, at least as respects the '843 patent, the discussion of which contains the foregoing text,[13] TII's conduct in obtaining the patent was not challenged as wrongful. Nonetheless, in *Texas Instruments, Inc.,* albeit in dictum, the Federal Circuit reiterated the *Kingsdown* language here at issue and indicated again, as a broad proposition relating to patent law, that there is nothing inherently improper in amending patent claims in order to cover competitors' products.

The Federal Circuit next returned to the at-issue *Kingsdown* language in *Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473 (Fed.Cir.1998), wherein Multiform Desiccants, Inc. ("Multiform") added certain language to its claims during the patent prosecution of the patent-in-suit. Subsequently, in defending against Multiform's claims of patent infringement, Medzam, Ltd. ("Medzam") uncovered evidence supportive of a finding that Multi-form had added that language to its claims specifically in order to cover Medzam products of which Multiform had learned during the pendency of its patent application.

The district court entered judgment of non-infringement, finding that Medzam's product did not infringe Multiform's patent. The district court, however, refused to grant Medzam's request for attorneys fees under 35 U.S.C. § 285, in part, because it rejected Medzam's argument that Multiform acted in bad faith by adding a claim to try to cover Medzam's accused product. 133 F.3d at 1475.[14] Multiform appealed the finding of non-infringement, and Medzam cross-appealed, *inter alia,* the trial court's denial of attorneys fees.

On appeal, the Federal Circuit upheld the district court's finding that Medzam's accused product did not infringe Multiform's patent, either literally or under the doctrine of equivalents. *Multiform Desiccants, Inc.,* 133 F.3d at 1480–81. The Court of Appeals also upheld the district court's refusal to grant attorneys fees in Medzam's favor. Among Medzam's asserted bases for an award of attorneys fees was an argument that, in amending its claims, Multiform had engaged in bad faith. The Federal Circuit rejected that contention with a cite to *Kingsdown:*

> Medzam also argues that it was an act of bad faith for Multiform to add ... claims to the '266 patent in an attempt to cover Medzam's products. However, it is neither illegal nor bad faith for an applicant to amend the claims in view of a competitor's product. *See Kingsdown* ... ("[N]or is it in any manner improper to amend or insert claims intended to

---

**13.** *Texas Instruments, Inc.* involved many patents and patent claims and implicated many legal doctrines; the statement quoted above, however, pertains to no other issue in the case.

**14.** Under 35 U.S.C. § 285, a "court in exceptional cases may award reasonable attorney fees to the prevailing party" in a patent infringement suit.

cover a competitor's product the applicant's attorney has learned about during the prosecution.")...

*Multiform Desiccants, Inc.*, 133 F.3d at 1482. Thus, in the context of deciding whether a case was "exceptional" for purposes of the awarding of attorney fees under 35 U.S.C. § 285, the Federal Circuit, in *Multiform Desiccants, Inc.*, reiterated the here at-issue *Kingsdown* language.

█ In 2002, the Federal Circuit again cited that portion of *Kingsdown* in deciding *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235 (Fed.Cir.2002), wherein Platte Chemical Company ("Platte") alleged that products manufactured by PIN/NIP, Incorporated ("PIN/NIP") infringed multiple claims of a patent to which Platte was an assignee.[15] Among other defenses to these allegations of infringement, PIN/NIP contended that claim 33 of the '912 patent, which Platte alleged PIN/NIP to have infringed, was invalid for failing to satisfy the written description requirement of 35 U.S.C. § 112. *PIN/NIP, Inc.*, 304 F.3d at 1237; *see also* 35 U.S.C. § 112 ("The specification shall contain a written description of the invention.").[16] The evidence showed that claim 33 was added after the inventors learned that subsequent to the filing of the initial application, PIN/NIP had publicly disclosed a method for treating potatoes in which the separate chemicals were added in spaced, sequential applications rather than in a mixture.

PIN/NIP argued that claim 33 was invalid under 35 U.S.C. § 112 because the claim extended beyond the invention as

described in the originally filed application. *PIN/NIP, Inc.*, 304 F.3d at 1247. Specifically, PIN/NIP asserted that claim 33, which, as mentioned, defined a spaced, sequential application of the utilized chemicals, extended beyond the invention as described in the originally filed specification, which described an application of the chemicals in a unitary mixture. *Id.* In response, Platte argued that, although claim 33 was admittedly broader than the original application, the subject matter of claim 33 was actually and adequately disclosed in the original specification.

The jury, among other findings not here relevant, agreed with Platte, finding that claim 33 satisfied the written description requirement. On appeal, however, the Federal Circuit reversed this finding, holding that nothing in the specification indicated that the invention claimed anything other than a mixture of chemicals whereas the claim-in-suit described an invention intended to encompass separate unitary applications of the chemicals to the potatoes. The Federal Circuit stated:

> Platte even admits that "claim 33, as written, is arguably broader than the examples disclosed in the '912 patent." While it is legitimate to amend claims or add claims to a patent application purposefully to encompass devices or processes of others, there must be support for such amendments or additions in the originally filed application. *See Kingsdown* ... ("[N]or is it in any manner improper to amend or insert claims intended to cover a competitor's product

---

**15.** The patent-in-suit, United States Patent No. 5,622,912 (the "'912 patent") was directed to a composition and method for inhibiting sprout growth in potatoes and other tubers.

**16.** As discussed in more detail *infra*, in order to satisfy the written description requirement, any claims contained in subsequently filed amendments, continuation, or divisional ap-

plications must be supported by the original specification. *Cooper Cameron Corp. v. Kvaerner Oilfield Prods.*, 291 F.3d 1317, 1323 (Fed. Cir.2002); *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1571–72 (Fed.Cir.1997); *Applied Materials, Inc. v. Advanced Semiconductor Materials America, Inc.*, 98 F.3d 1563, 1579 (Fed.Cir.1996) (Mayer, J. concurring).

the applicant's attorney has learned about during the prosecution of a patent application. Any such amendment or insertion must comply with all statutes and regulations, of course, but, if it does, its genesis in the marketplace is simply irrelevant."). In this case, the originally filed application, which is devoid of any mention or even implication that the two chemicals can be applied in a spaced, sequential manner, does not support the later-added claim 33.

*PIN/NIP, Inc.*, 304 F.3d at 1247–48. Thus, in *PIN/NIP, Inc.*, the Court of Appeals took no issue with the fact that the inventor had filed an additional claim apparently based on ideas gained from a competitor's product; rather, it held that the later claim was invalid because the claim lacked support in the specification.

Lastly, earlier this year, the Federal Circuit returned to the pertinent *Kingsdown* language in *Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898 (Fed.Cir.2004), wherein the Liebel–Flarsheim Company ("Liebel") alleged that products manufactured by Medrad, Inc. ("Medrad") infringed various of its patents. The patents related to certain methods and devices for use in connection with powered fluid injectors, which are used to inject fluids into patients during medical procedures. *Medrad, Inc.*, 358 F.3d at 900.

The district court granted summary judgment of non-infringement and Medzam appealed. For reasons not here pertinent, the Federal Circuit reversed the summary judgment ruling. However, in an attempt to give meaning to several claim terms, the Federal Circuit, as had the district court, examined the prosecution history of the patents. In so doing, the Federal Circuit noted that, during the pendency of the patent prosecution, Liebel learned about a "jacketless" injector made by Medrad and filed additional claims which omitted any reference to a jacket "in

order to encompass Medrad's injector." *Medrad, Inc.*, 358 F.3d at 909. Immediately after making this statement, the court dropped a footnote that made reference to *Kingsdown:*

> The district court recognized that it is not improper for an applicant to broaden his claims during prosecution in order to encompass a competitor's product, as long as the disclosure supports the broadened claims. *See Kingsdown* ... (holding that it is not improper "to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the prosecution of a patent application"). If the disclosure does not support the broadened claims, the applicant will not be accorded priority based on the original disclosure, and the claims may be invalidated.

*Medrad, Inc.*, 358 F.3d at 909 n. 2. It is not readily apparent why that language was cited because there was no challenge to the broadened claim. Nonetheless, although again in dictum, the Federal Circuit in *Medrad, Inc.* reiterated the notion that, as a matter of patent law, there is nothing improper about prosecuting a patent in such a way as to encompass competitors' products.

Understood in the context in which they were decided, *Kingsdown* and its progeny stand for the unremarkable proposition that amending a patent application to cover a competitor's product is not, in and of itself, sufficient to show deceptive intent or bad faith under the patent laws. In addition, the cases stand for the proposition that prosecuting a patent in order to cover a competitor's product is not an illegitimate practice under the patent laws, provided that the patent applicant otherwise complies with the law. Against this background, it is now appropriate to resolve Rambus' motion *in limine.*

## III. *Kingsdown* and its Progeny do not Support Rambus' Motion *in Limine*

Rambus contends that, in light of *Kingsdown* and the other decisions discussed above in DISCUSSION Section II, any proof or argument by Infineon that Rambus "stole," misappropriated, or misused ideas from JEDEC would be improper and would serve solely to inflame unfairly the jury. Also, relying on *Kingsdown* and its progeny, Rambus argues that, even if Infineon's factual allegations respecting Rambus' conduct at JEDEC are true, those decisions by the Federal Circuit clearly permit the alleged conduct and, therefore, those decisions foreclose the admission of evidence respecting how Rambus acquired the information that it used to secure the patents-in-suit.

To be sure, Rambus agrees that it would be rather odd if the law were to allow patent applicants to misappropriate the ideas and inventions of others and then secure patents on them. According to Rambus, however, the patent law itself provides the sole and sufficient protection against the absurdity of an outcome where an "inventor" is awarded a patent covering an invention acquired wrongfully from someone else. Specifically, Rambus argues that the provisions of 35 U.S.C. §§ 112, 120, 121 and 132 foreclose that result, and that, because of *Kingsdown*, the evidence that Infineon seeks to introduce in support of its monopolization and unfair business practices claims and any of its defenses is likewise foreclosed.

■■■ Under 35 U.S.C. § 112, a patent specification must, among other requirements, contain a "written description" of the invention. Under 35 U.S.C. § 112, the specification also must convey with reasonable clarity to those skilled in the art that, as of the filing date, the patent holder was "in possession of the invention" now claimed in the patent. *Vas–Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1560–61 (Fed. Cir.1991). As a corollary, by virtue of 35 U.S.C. § 132(a), any amendment to a patent application must not contain any "new matter," that is, matter that describes a different invention or adds to or changes the nature of the invention disclosed in the specification. *Regents of Univ. of N.M. v. Knight*, 321 F.3d 1111, 1121 (Fed.Cir. 2003). Likewise, to enjoy the priority date of the original application, any continuation or divisional application must also meet these requirements. 35 U.S.C. §§ 120, 121; *see also Applied Materials, Inc. v. Advanced Semiconductor Materials America, Inc.*, 98 F.3d 1563, 1579 (Fed. Cir.1996) (Mayer, J. concurring); *Mahurkar*, 935 F.2d at 1560.[17]

According to Rambus, the requirement of support in the original application for any later-issued claims, along with the prohibition against newly added material, are the mechanisms, and indeed, says Rambus, are the *only* mechanisms that fetter the conduct of patent applicants when making patent claims. This contention is based largely on the decision in *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313 (Fed.Cir.2003), wherein the Federal Circuit explained that:

> The purpose of the written description requirement is to prevent an applicant from later asserting that he invented that which he did not; the applicant for a patent is therefore required to recount his invention in such detail that his future claims can be determined to be encompassed within his original creation.

314 F.3d at 1330; *see also Mahurkar*, 935 F.2d at 1563–64 (holding that the written description requirement requires patent applicant to "convey with reasonable clari-

---

**17.** Here, all the patents-in-suit claim priority to the '898 application, filed in 1990.

ty to those skilled in the art that, as of the filing date sought, he or she was in possession *of the invention.* The invention is, for purposes of the 'written description' inquiry, *whatever is now claimed* ") (emphasis in original).

Rambus, of course, is correct that, as *Amgen* explains, the patent system itself provides a mechanism to confine patent applicants to the structures of lawful conduct in prosecuting patents and to prevent the outright stealing or misappropriation of inventions. The problem with Rambus' position is that it would leave the above surveyed patent law as the *only* check on, and remedy for, abuse. At bottom, Rambus reads *Kingsdown* for the proposition that, so long as any later-added claims are adequately disclosed in the original application, it makes absolutely no difference whether the applicant violated any other law when acquiring the information that is added later.[18] Rambus' contention is wrong for several reasons.

First, *Kingsdown* itself simply does not reach to the extreme that Rambus urges. Rather, in *Kingsdown,* the Federal Circuit circumscribed the rule there announced by explaining that the "genesis [of the amendment] in the marketplace is simply irrelevant and cannot *of itself* evidence deceitful intent." *Kingsdown,* 863 F.2d at 874 (emphasis added). Thus, *Kingsdown* itself dealt with what is already in the marketplace, not with an industry stan-

dard that is under development. More importantly, *Kingsdown* clearly says that the genesis of the amendment in the marketplace, standing alone, cannot evidence deceitful intent. *Kingsdown* thus does not foreclose consideration of the effect of the genesis of the idea together with evidence of other conduct, particularly not conduct that is unlawful under applicable statutes. Indeed, *Kingsdown* makes clear that the amendment "must comply with all statutes and regulations." [19] These circumscribing factors are not, in any way, eliminated in the ensuing decisions interpreting *Kingsdown.* Yet, under Rambus' theory, those factors would no longer circumscribe the application of *Kingsdown.*

Second, if given the effect for which Rambus presses, the rule of *Kingsdown* would lead to absurd results. For instance, under Rambus' theory, if an individual, who has a pending patent application with the PTO, commits industrial espionage, bribery, breaking and entering, or outright threats and intimidation, and thereby obtains concepts that he later uses to amend his patent application, *Kingsdown* confers legitimacy on the patent that is thereafter issued, and no evidence of those facts can be introduced for any purpose. Transcript of Hearing, *Rambus, Inc. v. Infineon Tech. AG,* No. 3:00CV524, July 16, 2004, at 7–10. To Rambus, the aggrieved party's remedy

---

18. In *Kingsdown,* and indeed in the subsequent Federal Circuit cases, the Federal Circuit did not discuss in any depth how the patent-applicant learned of the competing product. In the background of the cases, however, is the notion that the patent-applicant's observation of the competing product simply occurred in the market. For instance, in *PIN/NIP, Inc.,* the court stated that the inventors filed additional claims after "PIN/NIP had publicly disclosed" a new method. 304 F.3d at 1239. Similarly, in *Kingsdown* itself the court recounted that, "Kingsdown's patent attorney saw a two-piece ostomy appli-

ance manufactured by Hollister," 863 F.2d at 870, suggesting that the lawyer simply viewed a device that had been released into the market. Suffice it to say that, in none of the cases, did the patent holder learn of the later-added inventions through its participation in a standard-setting organization.

19. Rambus suggests that this means "all patent statutes and regulations." That, however, is not what the Federal Circuit said: the rule is that the amendment "must comply with *all* statutes and regulations." 863 F.2d at 874 (emphasis added).

lies in the fact that the individual engaging in such conduct could be pursued in a separate action, either civilly or criminally, for the act of bribery, espionage, breaking and entering, or assault. But, according to Rambus, because of *Kingsdown*, a jury would need to be told that the unlawful methods through which the applicant obtained the concepts underlying the later-added claims cannot be considered in determining whether the ultimately issued patents were valid or for any other purpose legitimately in the case.[20]

*Kingsdown* stands for the proposition that the patent laws are not offended if a patent applicant amends a pending application to cover a product that it observed in the market. The rule of *Kingsdown* cannot reasonably be extended to mean that it is appropriate or lawful to amend a pending patent application to secure patents when the act of doing so is part of conduct that violates other non-patent laws, for instance, 15 U.S.C. § 2. Otherwise, *Kingsdown*, as posited by Rambus, would operate to give unscrupulous persons an incentive to violate a panoply of civil and criminal laws knowing that the behavior will yield financial success by way of a valid patent. Indeed, such a patent could be sold for a profit to an innocent purchaser for value and thus placed beyond the reach of remedies that would apply to deal with the wrongdoer.[21]

**20.** Although the Court will deny Rambus' motion *in limine*, it may well be that the term "stolen," even under Infineon's theory of the case, is an inappropriate term to use in describing Rambus' conduct. There are disputes of fact respecting whether proposed JEDEC standards were available to non-JEDEC members and whether, and, to what extent, they were to remain confidential. Although it is undisputed that minutes of JEDEC meetings were available to non-JEDEC members, it is unclear what these minutes consisted of. According to Infineon, proposed standards offered at JEDEC were supposed to remain confidential. Regardless, even under Infineon's theory of the case, Rambus did not come into possession of the information wrongly. Rather, as a member of JEDEC, it was entitled to know of the proposed standards; thus, it is difficult to understand how Rambus can be said to have "stolen" the information. In other words, although Infineon uses the term "stolen" in describing Rambus' actions, the import of Infineon's allegations is more that Rambus misappropriated the information learned at JEDEC, using it to guide its patent prosecution in order to effectuate a monopoly and in a way that constituted an unfair business practice. This issue will need to be sorted out after the factual record is developed at trial.

**21.** Infineon further argues that its equitable defense of prosecution laches allows it to introduce evidence and argument on Rambus' use of information gleaned at JEDEC in the prosecution of the patents-in-suit. Infineon contends that, notwithstanding *Kingsdown*, amending a patent application to cover a competitor's product can be pertinent under the doctrine of prosecution laches. *See Webster Elec. v. Splitdorf Elec. Co.*, 264 U.S. 463, 44 S.Ct. 342, 68 L.Ed. 792 (1924); *Woodbridge v. United States*, 263 U.S. 50, 44 S.Ct. 45, 68 L.Ed. 159 (1923); *Chiron Corp. v. Genentech, Inc.*, 268 F.Supp.2d 1139 (E.D.Cal.2002). Specifically, referencing its prosecution laches defense, Infineon contends that Rambus deliberately stood by while the DRAM industry grew up around the JEDEC standards and, as a component of this effort, amended its claims in order to capture the JEDEC standard. There is evidence to support that theory and, interestingly, in response, Rambus does not really argue that Infineon's proposed use of the JEDEC evidence is not probative of its prosecution laches defense. Rather, Rambus challenges the merits of Infineon's prosecution laches defense. Stated otherwise, in responding to Infineon's argument on this score, Rambus more-or-less raises a summary judgment challenge to Infineon's ability to proceed on the defense of prosecution laches. This, of course, is improper. Summary judgment motions have already been filed, briefed, argued, and ruled on. It is simply too late for Rambus to move, especially in stealth form, for summary judgment on Infineon's prosecution laches defense.

Further, and more importantly for this case, Rambus also argues that *Kingsdown* establishes the proposition that prosecuting a patent in the PTO in such a way as to cover the products of others can simply never be wrongful or illegal, under any set of facts or precepts of law. And, according to Rambus, that is so even if Infineon proves that Rambus' actions were wrongful and monopolistic under the Sherman Act or an "unfair business practice" under Cal. Bus. & Prof.Code § 17200.

The Federal Circuit, however, has never taken such an extreme position. Nor has the Federal Circuit ever held that it is always legitimate, no matter what the factual or legal context, for a patent applicant to add patent claims covering a competitor's product. Indeed, the court, in *Kingsdown* itself, held that a patent applicant must, of course, "comply with all statutes and regulations." Accordingly, under the explicit text of *Kingsdown*, if Rambus' actions violated the Sherman Act or Cal. Bus. & Prof.Code § 17200, the general rule of *Kingsdown* does not protect Rambus. Indeed, an examination of the counterclaims at issue in this case, and Rambus' *Kingsdown*-based responses thereto, shows the incorrectness of Rambus' interpretation of *Kingsdown*.[22]

■ Third, the factual setting in which the *Kingsdown* text on which Rambus relies is far different than the facts on which this action will be tried. In this case, Infineon proffers Rambus' conduct of attending JEDEC meetings for the purpose of obtaining information to guide its prosecution in the PTO as a component of its monopolization counterclaim and of its unfair business practices counterclaim under Cal. Bus. & Prof.Code § 17200. Def. Mem. Regarding *Kingsdown*, June 18, 2004, at 17.[23] Infineon argues that Ram-

**22.** Further, Infineon's non-patent law based counterclaims aside, as a matter of the patent-law regime surveyed above, Rambus' motion *in limine* is misplaced. For instance, under 35 U.S.C. § 112, the patent specification must "convey with reasonable clarity to those skilled in the art that, as of the filing date [the patent holder] was in possession of the invention." *Vas–Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed.Cir.1991). Here, Infineon asserts (and there is evidence to show) that, as of the filing of the '898 application, Rambus was not in possession of the inventions claimed by the patents-in-suit. Rather, according to Infineon, Rambus only thought to expand its patents to cover those technologies *after* it learned about them at JEDEC. And, under Federal Circuit decisional law, the evidence that Rambus is here seeking to preclude is probative to the 35 U.S.C. § 112 inquiry. *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed.Cir.1998) ("Finally, although not dispositive, because one can add claims to a pending application directed to adequately described subject matter, Sproule admitted at trial that he did not consider placing the controls outside the console until he became aware that some of Gentry's competitors were so locating the recliner controls. Accordingly, when viewed in its entirety, the disclosure is limited to sofas in which the recliner control is located on the console."). In other words, as a part of its 35 U.S.C. § 112 defense, Infineon, in its attempt to show that Rambus was not in possession of the disputed inventions at the time it filed the '898 application, can offer evidence and argument that, far from disclosing the inventions in the '898 application, Rambus in fact only learned of the inventions from its attendance at JEDEC. Thus, as part of its written description defense, Infineon can show that Rambus used information learned at JEDEC to guide its patent prosecution in order to cover technologies that it did not actually invent and that were not disclosed in the '898 application. This fact alone requires denial of Rambus' motion *in limine*.

**23.** The offense of monopoly under 15 U.S.C. § 2 has two principal elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). To the extent that Infineon's Section 17200 claim is based on the California statute's "unlawful" prong,

bus' amendment of its patent applications based on information it obtained at JEDEC was part of Rambus' anticompetitive scheme and wrongful acquisition of monopoly power in the worldwide DRAM market. Further, Infineon maintains that Rambus' actions constituted an unlawful business practice under the California statute. And, there is evidence to support those allegations. As the fulsome recounting undertaken above illustrated, *Kingsdown* and its progeny did not involve alleged violations of such statutes.

Notwithstanding these distinguishing factors, Rambus asserts that *Kingsdown* and its progeny forecloses any evidence, or argument, that, by amending its claims in order to cover the JEDEC standards, Rambus was engaged in monopolistic conduct or in an unfair business practice. In other words, Rambus is attempting to use *Kingsdown* for the proposition that a company, without running afoul of the Sherman Act, Section 17200, or any other law, can join a standard-setting organization ("SSO"), which is dedicated to the adoption of open standards,[24] for the purpose of learning about proposed standards, and then can use the knowledge thereby gained to guide its patent applications with the PTO in order to cover the standards issued by the SSO. Nor, according to Rambus, can such evidence be used in defense of a patent infringement claim.

There are several problems with Rambus' arguments. Most basically, neither the *Kingsdown* decision itself, nor any of the subsequent cases, involved facts remotely similar to those presented here. In *Kingsdown* and the subsequent cases, the Federal Circuit stated that it is not

"improper to amend or insert claims intended to cover a competitor's product the applicant's attorney has learned about during the [patent's] prosecution." That, however, according to Infineon's theory of the case and indeed the evidence, is not at all what happened here.

Here, there is evidence to support Infineon's contention that Rambus amended its claims not to cover a "product," but rather to cover a contemplated industry standard with a view toward capturing the entire DRAM market in its patent snare. Moreover, this standard (rather than "product") was not really that of a "competitor," as the Federal Circuit in *Kingsdown* and its progeny used the term, but was that of an SSO dedicated to the adoption of open standards. In other words, rather than the two manufacturers competing in the market as in *Multiform Desiccants, Inc.*, this case involves an organization of horizontal competitors who were acting in unison to develop an open standard. And, according to Infineon's allegations, this is not a case wherein a patent applicant simply "learned about" a "competitor's product," but rather a situation where a patent applicant joined an SSO, at least in part, for the express purpose of learning about contemplated standards in order to guide its patent prosecution as part of its effort to achieve a monopoly.[25]

In sum, the *Kingsdown* rule was not made, and has never been applied, in the context of an industry wide standard or an SSO. Rather, *Kingsdown* and subsequent cases involved the amending of a patent application to add claims intended to cover a single competitor's product of which the

---

Infineon's Section 17200 claim also turns on these two elements.

24. An "open standard" is a standard that a manufacturer can practice without infringing any patents or intellectual property. In other words, a product manufactured in conform-

ance with an open standard is non-royalty bearing.

25. There are, as mentioned, disputes of fact respecting the general public availability of the proposed JEDEC standards. *See supra,* footnote 20.

applicant had learned by simply monitoring the market.

Standard-setting organizations allow industry players to meet as a group and exercise influence on their particular industry. It almost goes without saying, therefore, that the collusive atmosphere of an SSO presents a very real opportunity for anticompetitive behavior. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988) ("Agreement on a product standard is, after all, implicitly an agreement not to manufacturer, distribute, or purchase certain types of products. Accordingly, private standard-setting associations have traditionally been objects of antitrust scrutiny."); *American Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 571, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) ("[A] standard-setting organization ... can be rife with opportunities for anticompetitive activity."); *see also* David M. Schneck, *Setting the Standard: Problems Presented to Patent Holders Participating in the Creation of Industry Uniformity Standards*, 20 Hastings Comm. & Ent. L.J. 641, 655 (1998) ("Standardization involves agreements among horizontal competitors, which draws antitrust scrutiny.").

Nonetheless, because of the need for interoperability [26] in certain industries, SSOs are tolerated. Indeed, far from being anticompetitive or merely benign, SSOs generally have beneficial effects on competition. David A. Balto, *Standard Setting in the 21st Century Network Economy*, 18 No. 6 Computer & Internet L. 5, 7 (2001). Product uniformity through standardization, especially in technological markets, facilitates the comparison of competing products, which benefits consumers in the short run and provides incentives for engineers to develop the next genera-

tion of compatible products, thereby providing longer-term consumer benefits. James C. De Vellis, *Patenting Industry Standards: Balancing the Rights of Patent Holders with the Need for Industry-Wide Standards*, 31 AIPLA Q.J. 301, 316 (2003). Likewise, new producers have easier entry into a market when standards exist, thus also increasing competition. In addition, a future product will have the additional benefit of a longer product life if it revolves around an existing standard; a standardized technology core also lowers a company's cost of developing a next generation product. Finally, producers have lower marketing costs in bringing products to a predefined, standardized market. David M. Schneck, *Setting the Standard: Problems Presented to Patent Holders Participating in the Creation of Industry Uniformity Standards*, 20 Hastings Comm. & Ent. L.J. 641, 642 (1998). For all these reasons, when they operate correctly, SSOs foster competition.

Notwithstanding these benefits, the fact remains that SSOs inherently are "rife with opportunities for anticompetitive activity." *American Soc'y of Mech. Eng'rs*, 456 U.S. at 571, 102 S.Ct. 1935. An SSO affords the potential for industry players to act together and exert their anticompetitive conduct throughout the remainder of the industry. Moreover, even if the SSO itself is not corrupt, the subversion of an SSO by a single industry player or by a limited subset of SSO members can result in anticompetitive outcomes. Thus, antitrust law historically has been concerned with the risk of one or a small number of participants capturing the economic power of an industry-wide standard and turning the SSO into a source of exclusionary power. Simply put, by hijacking or capturing

---

**26.** "Interoperability" is simply the ability of one manufacturer's product to interface with other manufacturers' products. Mark A. Lemley, *Standardizing Government Standard-Setting Policy for Electronic Commerce*, 14 Berkeley Tech. L.J. 745, 746 (1999).

an SSO, a single industry player can magnify its power and effectuate anticompetitive effects on the market in question. That, of course, is what Infineon proposes to prove that Rambus has done.

The decision in *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988), is instructive. The National Fire Protection Association ("NFPA") is an SSO which publishes, among other things, the National Electrical Code ("NEC"). The NEC establishes product and performance requirements for the design and installation of electrical wiring systems; these standards are revised every three years. A substantial number of state and local governments routinely adopt the NEC wholesale into law. Moreover, private certification laboratories often will not list or label an electrical product unless it complies with NEC standards. Likewise, many electrical contractors and distributors will not use or sell a product that is not NEC compliant. *Indian Head*, 486 U.S. at 496, 108 S.Ct. 1931. For these reasons, it is in a manufacturer's obvious interest to produce NEC compliant goods.

Among the types of products covered by the NEC is "electrical conduit," that is, the hollow tubing used to carry electrical wires through the walls, floors, and ceilings of buildings. In the 1970s, the NEC only certified electrical conduit made of steel. Starting in 1980, however, Indian Head, Inc. ("Indian Head") began offering electrical conduit made of polyvinyl chloride. Thereafter, Indian Head initiated a proposal with NFPA to include polyvinyl chloride conduit as an approved type of electrical conduit in the NEC. Following approval by one of the NFPA's panels,

Indian Head's proposal was scheduled for consideration at the 1980 annual NFPA meeting, where it could be rejected or adopted by a simple majority of the members present. *Indian Head*, 486 U.S. at 496, 108 S.Ct. 1931.

Allied Tube and Conduit Corporation ("Allied Tube"), which, at that point in time, was the nation's largest producer of steel conduit, became worried that Indian Head's polyvinyl chloride product would cut into its market. Allied Tube, therefore, along with several other electrical conduit manufacturers and distributers, agreed to pack the 1980 NFPA meeting with new members whose only function would be to vote against Indian Head's proposal. Thus, Allied Tube recruited over 150 persons, including employees, executives, sales agents, the agents' employees, and the wife of a sales director, for this scheme. Allied Tube paid for the NFPA memberships for these individuals, as well as for their registration and attendance expenses for the 1980 meeting. The vast majority of these individuals did not have the technical expertise or background necessary to understand the discussions held at the meeting; indeed, none of them spoke at the meeting or participated in any manner save voting. With Allied Tube's ringers in place, Indian Head's proposal was easily defeated. *Indian Head*, 486 U.S. at 497, 108 S.Ct. 1931.

■ Thereafter, Indian Head brought a federal antitrust action alleging that Allied Tube unreasonably had restrained trade in the electrical conduit market in violation of federal law. The jury, instructed under the "rule of reason,"[27] found Allied Tube liable. In so finding, the jury returned special interrogatories that, *inter alia*, Al-

---

27. The "rule of reason" requires the finder of fact to weigh the anticompetitive effects of the at-issue conduct against the procompetitive effects the conduct might have had. Stated otherwise, it requires the fact finder to determine whether the challenged conduct, on balance, promotes or suppresses competition. *National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 691, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).

lied Tube had not violated any of NFPA's rules. Nonetheless, the jury indicated that Allied Tube, by packing the meeting, had "subvert[ed]" the consensus standard-making process of the NFPA and thereby illegally restrained trade. *Indian Head*, 486 U.S. at 498, 108 S.Ct. 1931. The district court, however, overturned this verdict because it found that the NFPA was akin to a governmental legislature and thus Allied Tube's actions were protected under the *Noerr–Pennington* doctrine.[28]

On appeal to the United States Court of Appeals for the Second Circuit and later the Supreme Court of the United States, the key issue was whether Allied Tube was entitled to *Noerr–Pennington* immunity. Ultimately, the Second Circuit, and then the Supreme Court, rejected the district court's holding that the NFPA was akin to a legislature, and held that the district court's application of *Noerr–Pennington* was in error, as was its attendant reversal of the jury's verdict. *Indian Head*, 486 U.S. at 510, 108 S.Ct. 1931.

The Supreme Court's principal holding in *Indian Head*, which turned on an interpretation of the *Noerr–Pennington* doctrine, is, of course, not directly relevant to this case. In deciding the case, however, the Court embraced the notion that an entity's conduct at an SSO may run afoul of the antitrust laws even if that entity did not violate the SSO's express rules. *Id.* at 509, 108 S.Ct. 1931 ("The antitrust validity of these efforts is not established, without more, by petitioner's literal compliance with the rules of the association.").[29] And, addressing SSOs generally, the Court stat-

ed that the antitrust laws tolerate SSOs because, when functioning properly, such entities benefit competition. The Court, however, recognized the obvious fact that, when commandeered by a subset of industry players or, by obvious extension, a single industry player, conduct at an SSO may violate the antitrust laws:

> [P]rivate standard-setting by associations comprising firms with horizontal and vertical relations is permitted at all under the antitrust laws *only on the understanding that it will be conducted in a nonpartisan manner offering pro-competitive benefits.*

486 U.S. at 506–7, 108 S.Ct. 1931 (emphasis added). Thus, if an SSO is conducted (or subverted) in a partisan manner that results in anticompetitive results, such activity may run afoul of the antitrust laws. *Id.* at 511, 108 S.Ct. 1931.

Application of these concepts negates Rambus' arguments that its alleged conduct at JEDEC, if proven, was appropriate or lawful. Rather, if, as Infineon says it can prove, Rambus joined an SSO dedicated to open standards, learned of standards and proposed standards through that membership, and then prosecuted its patents with the PTO to cover the standards, a jury could find that Rambus acted in a profoundly anticompetitive manner. In particular, a jury could find that, by guiding its patent applications to cover the JEDEC standards, Rambus was able to exert a tremendous amount of influence over the unaware DRAM industry; an industry comprised of manufacturers who had developed JEDEC-compliant products

---

**28.** The *Noerr–Pennington* doctrine, predicated on the cases of *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), holds that a concerted action consisting solely of activity aimed at influencing public officials does not violate the antitrust laws.

*City of Columbia v. Omni Outdoor Advertising*, 499 U.S. 365, 379–80, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991). In other words, it is a First Amendment gloss on the antitrust laws.

**29.** This, of course, means that, standing alone, the fact that Rambus did not violate JEDEC's patent disclosure policy does not insulate it absolutely from antitrust liability.

in the belief that such products would not be royalty bearing and who, if they wished to remain JEDEC compliant and manufacture the goods they had developed, thus needed to obtain Rambus licenses or suffer prosecution. In other words, a jury could find, on the record evidence if given credence, that Rambus' conduct allowed it to obtain its market power, not through superior products, historical accident, or business acumen, but through unlawful behavior. Any sensible interpretation of 15 U.S.C. § 2 would recognize that this conduct, if proven, is behavior violative of the monopoly law. Similarly, under California jurisprudence, the alleged conduct, if proven, would constitute an unfair business practice under Cal. Bus. & Prof.Code § 17200. *Cel–Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999).

Moreover, Rambus' contentions to the contrary notwithstanding, the *Kingsdown* line of cases says absolutely nothing about the antitrust or unfair business practices liability of a corporate patent applicant which acts to hijack a SSO; the *Kingsdown* line of cases—all of which were decided solely under the patent law—all involved a patent holder which amended its application in order to cover a single competitor's product. And, none of those decisions involved alleged monopolistic behavior or conduct alleged to have violated an unfair business practice statute. Hence, neither *Kingsdown* nor its progeny have been applied to the circumstances or the legal theories at issue in this action.

■ The patent statutes and the decisional law implementing them do not exist or operate in isolation. Rather, they are a part of the legal fabric of a society that imposes on its citizens, individual and corporate, other legal constraints that cannot, as Rambus would have it, be rendered meaningless or marginalized by the dis-torted application of a principle of patent law that, in context and in its place, is no doubt valid. Indeed, the patent laws must, and certainly can, coexist with the other statutes that control the conduct of commerce. *See generally* Herbert Hovenkamp, Mark D. Janis, & Mark A. Lemley, *Intellectual Property & Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property Law* (2004). In the context of this litigation, appropriate instructions can be crafted to facilitate that kind of coexistence. To be sure, such instructions must be tailored to fit the evidence and to account for the controlling law, patent and otherwise. That effort, of course, is better accomplished later in perspective of the case as it develops at trial. Followed to its conclusion, however, the logic offered by Rambus in support of its motion *in limine* would foreclose completely an outcome wherein patent law is given its rightful holistic place within the law as a whole.

### CONCLUSION

For the reasons stated above, the Court declines Rambus' invitation to apply *Kingsdown* in an extreme manner never authorized by the Federal Circuit and in a way that elevates a valid precept of patent law to a position of jurisprudential primacy for which there is no precedent. Accordingly, Plaintiff's Motion *in Limine* No. 2, to Exclude Evidence or Argument that Plaintiff's Amendment of Patent Claims was Based on "Stolen" Ideas or was Otherwise Wrongful or Illegal (Docket No. 576) will be denied.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.